UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

DEFENDERS OF WILDLIFE, <u>et al.</u>,)
)
        Plaintiffs,      )
)
          v.         )     Civil Action No.
)     04-1230 (GK)
DIRK KEMPTHORNE, <u>et al.</u>,  )
)
        Defendants.   )
_____)

## <u>MEMORANDUM OPINION</u>

("Lynx IV")

Plaintiffs are ten not-for-profit environmental organizations dedicated to the conservation of endangered species, including the Canada Lynx (<u>Felis</u> <u>Lynx</u> <u>Canadensis</u>), and one individual who has been involved with efforts to protect the Lynx since 1989.[1]

Defendants, who are sued in their official capacities, are Dirk Kempthorne, Secretary of the U.S. Department of the Interior (the "Secretary"); Dale Hall, Director of the U.S. Fish and Wildlife Service ("FWS" or the "Service"); Carlos M. Gutierrez, Secretary of the U.S. Department of Commerce; William T. Hogarth, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Association ("NOAA"); and Mike Johanns, Secretary of

---

[1] Plaintiffs are Defenders of Wildlife, Northwest Ecosystem Alliance, The Fund for Animals, Humane Society of the United States, Kettle Range Conservation Group, Oregon Natural Resources Council, Restore: The North Woods, Superior Wilderness Action Network, American Lands Alliance, Center for Biological Diversity, and Mark Skatrud.

the U.S. Department of Agriculture ("USDA").[2]   In addition, the American Forest and Paper Association ("AFPA") has intervened in support of the Defendants.

Plaintiffs bring two distinct claims against Defendants. First, in the latest chapter of an almost decade-long dispute, they allege that FWS violated a 2002 Order of this Court requiring them to explain their finding that "collectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion" of the distinct population segment ("DPS") of the Lynx, and therefore that the Lynx should not be listed as "endangered" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq..

Second, Plaintiffs challenge a set of regulations issued in 2003 by several federal agencies including Interior, Commerce, and FWS, known as the "Joint Counterpart Endangered Species Act Section 7 Consultation Regulations" ("Counterpart Regulations" or "the Regulations.") See 68 Fed. Reg. 68254 (Dec. 8, 2003).  According to Plaintiffs, the Regulations are invalid under the ESA, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 1332 et seq., and

---

[2]  When Plaintiffs initially brought this action, Gale Norton was Secretary of Interior and the case was titled Defenders of Wildlife et al. v. Norton et al..  In the months since this case was filed, there has been significant turnover in the executive branch.  On May 26, 2006, for instance, Dirk Kempthorne succeeded Norton.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has automatically substituted Kempthorne, Hall, Gutierrez, and Johanns for their predecessors in office who were originally named as Defendants in this action.

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq..

This matter is now before the Court on Plaintiffs' Motion for Summary Judgment [Dkt. #36] and Defendants' Cross Motion for Summary Judgment [Dkt. #39].  Upon consideration of the Motions, Oppositions, and Replies, and the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part** and Defendants' Cross Motion for Summary Judgment is **granted in part and denied in part**.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[3]

A.   **Statutory Framework**

1.   **The Endangered Species Act ("ESA")**

The ESA is the "'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 698 (1995) (quoting Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978)).  When Congress enacted the statute in 1973, it intended to bring about the "better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants."  See 16 U.S.C. § 1531(a)(5).  Having found that a number of species of fish, wildlife, and plants in the

_____

[3]   Pursuant to Local Civil Rule 7(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Accordingly, unless otherwise noted, all facts are taken from the parties' Statements of Material Facts Not in Dispute.

United States had become extinct "as a consequence of economic growth and development untempered by adequate concern and conservation," Congress enacted the ESA in order to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species."  Id. § 1531.

The Act imposes certain responsibilities on the Secretary of the Interior who has in turn delegated day-to-day authority for its implementation to FWS, an entity within Interior.  See 16 U.S.C. § 1531(b); 50 C.F.R. § 402.01(b).  The ESA's protection of a species and its habitat is triggered only when FWS "lists" a species in danger of becoming extinct as either "endangered" or "threatened."  See 16 U.S.C. § 1533.  The Act defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  Id. § 1532(16).  FWS has issued a "Vertebrate Population Policy" delineating the circumstances under which the Service will list a "distinct population segment" or "DPS" of a species.  See 61 Fed. Reg. 4722.

A species is "endangered" when it is in "danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  When a species is "likely to become an endangered species within the foreseeable future," the statute defines it as "threatened."  Id. § 1532(20).

Endangered species are entitled to greater legal protection under the ESA than threatened species.  For any species listed as endangered, the ESA makes it unlawful for any person to "import any such species into, or export any such species from, the United States," or to "take any such species within the United States." Id. § 1538(a)(1)(A), (B).  Under the statute, the term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Id. § 1532(19).  For species that are listed as threatened, rather than endangered, the Secretary of the Interior "may," but is not required to, extend these prohibitions on taking and export.  Id. § 1533(d).

When FWS lists a species, it is also required to "concurrently" designate "critical habitat" for that species, unless it determines that such habitat "is not then determinable." Id. § 1533(a)(6)(C).  Critical habitat includes those specific areas which are presently "occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  Id. § 1532(5)(A)(i). Critical habitat may also include habitat that is unoccupied by the species at the time of the listing if FWS determines that such areas are "essential for the conservation of the species."  Id.

Pursuant to Section 7(a)(2) of the ESA, once a species is

listed as endangered or threatened, each federal agency that takes or authorizes an action that may affect that species must "insure," in "consultation" with either FWS or the National Marine Fisheries Service ("NMFS") (collectively the "Services"), that any such action "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [the species' designated critical] habitat."   Id. § 1536(a)(2).   As a practical matter, these consultation requirements apply primarily to "Action Agencies" such as the United States Forest Service ("USFS"), the Bureau of Land Management ("BLM"), the Army Corps of Engineers, and the Environmental Protection Agency.

FWS promulgated the default Section 7 consultation procedures and Congress later codified them in the 1978 ESA Amendments.   See 50 C.F.R. §§ 402.10 et al.; see also 1978 U.S.C.C.A.N. at 9462. Under the 1978 Amendments, an Action Agency bears the responsibility for determining whether its actions "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).   If the Agency makes the threshold determination that there is a possibility of such an effect, it must begin informal consultation with one of the Services.   Id.   The Action Agency may proceed only if, after evaluating the proposed action, the Agency determines that it "is not likely to adversely affect any listed species or critical habitat" and the relevant Service issues a written

concurrence with that determination.  Id. § (b)(1).

If, however, the Action Agency determines that there is a possibility of adverse impact, it must engage in formal consultation with the relevant Service.  That process requires the Service to prepare a detailed Biological Opinion describing whether, and if so how, the proposed action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." Id. § (g)(4).  If the Service finds that the action under review will jeopardize the continued existence of the species or destroy or "adversely modify" its critical habitat, the Service must set forth "reasonable and prudent alternatives" to avoid those results. Id. § (h)(3).

## 2. The National Environmental Policy Act ("NEPA")

The NEPA requires officials engaged in "major Federal actions" to complete an environmental assessment ("EA") that evaluates the action's potential environmental impacts and determines whether the statute's mandate for preparation of a more comprehensive environmental impact statement ("EIS") has been triggered.  See 42 U.S.C. § 4332(C).  "If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary." Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120, 126 (D.C. Cir. 1985) (citing 40 C.F.R. § 1501.4(e)).  If such a finding is made, however, the agency must offer an adequate explanation of its

conclusion.  See Humane Society of the United States v. Hodel, 840 F.2d 45, 61-62 (D.C. Cir. 1988).

Our circuit employs a four-part test to evaluate the adequacy of agency findings that an action will have no significant environmental impact.  That test considers: (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced that impact to a minimum.  See id. at 62.  As our Court of Appeals explained in Public Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256, 267 (D.C. Cir. 1988), a court's role in reviewing "no significant impact" determinations is "to ensure, primarily, that no arguably significant consequences have been ignored . . .".

**B.   Plaintiffs' Canada Lynx Claim**

Efforts to secure "endangered" status for the Canada Lynx—and the attendant legal protections for its habitat—have been ongoing for more than twenty years.  The history of Lynx-related litigation in this and other federal courts is documented in this Court's last opinion on the matter.  See Defenders of Wildlife et al. v. Norton et al., 239 F. Supp. 2d 9 (D.D.C. 2002) ("Lynx III").  As a result, the Court will limit its discussion here to the immediately-

relevant facts.

###    1.    The Canada Lynx

The Lynx is a medium-sized cat comparable in size to a bobcat. It is distinguished from other cats of similar size by its long legs and large paws, which make it particularly well-adapted for hunting in deep snow.  See 65 Fed. Reg. 16052 ("Lynx Final Rule"). In contrast to the bobcat, coyote, and other predators, which consume a variety of animals, the Lynx is a "specialized carnivore" that depends heavily on one particular prey—the snowshoe hare. See id.

The North American range of the Lynx currently extends from Alaska, through Canada, and into the northern part of the contiguous United States.  See id.  In Canada and Alaska, Lynx inhabit the boreal forest ecosystem; in the contiguous United States, the distribution of the Lynx is associated with the southern boreal forest, including subalpine coniferous forest in the West and mixed coniferous/deciduous forest in the East.  See id.

In the lower forty-eight states, Lynx range extends over four different regions: (1) the Northeast, (2) the Great Lakes, (3) the Southern Rocky Mountains, and (4) the Northern Rocky Mountains/Cascades.  See id. at 16054.  There is evidence that the Lynx may currently have been eradicated, or in ESA parlance "extirpated," from New Hampshire, Vermont and New York in the

Northeast region, and from Colorado and southeastern Wyoming in the Southern Rockies region.  The largest presence of Lynx population in the contiguous United States is in the Northern Rocky Mountains/Cascades region.  Id. at 16055-59.

### 2.   The Lynx's listing history

On July 8, 1998, after this Court had found procedural deficiencies in the Service's earlier consideration of the Lynx's status, FWS published a proposed rule to list as "threatened" the "contiguous U.S. distinct population segment of the Canada [L]ynx." 63 Fed. Reg. 36994 (July 8, 1998).  It determined that this population is in jeopardy from "human alteration of forests, low numbers as a result of past overexploitation, expansion of the range of competitors . . . and elevated levels of human access into [L]ynx habitat."  Id.

In finding that the U.S. population should be listed, the Service found that

> [b]ased on historic observations, trapping records and other evidence available to the Service at this time, the Service finds that, historically, Canada Lynx were resident in 16 of the contiguous United States.  The overall numbers and range of Canada Lynx in the contiguous United States are substantially reduced from historic levels. Currently, resident populations of Lynx likely exist in Maine, Montana, Washington, and possibly Minnesota. States with recent records of individual Lynx sightings, but possibly no longer sustaining self-supporting populations, include Wisconsin, Michigan, Oregon, Idaho, Wyoming, Utah, and Colorado.  Lynx may be extirpated from New Hampshire, Vermont, New York, Pennsylvania, and Massachusetts.

Id. at 37007.

-10-

On March 24, 2000, FWS published the Lynx Final Rule, listing as "threatened" the contiguous United States DPS of the Lynx.  See 65 Fed. Reg. 16052 (Mar. 24, 2000).  In so doing, the Service declared that "[c]ollectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS," and "do[] not contribute substantially to the persistence of the contiguous United States DPS."  Id. at 16066-67.

Plaintiffs brought suit again in this Court on December 14, 2000, challenging the Rule as arbitrary and capricious and therefore invalid under the APA.  Specifically, Plaintiffs attacked FWS's finding that three of the four regions comprising the Lynx's historic range were not a "significant portion" of that range.  See Defenders of Wildlife, 239 F. Supp. 2d at 18.

Because the ESA does not define the term "significant," the Court utilized a dictionary definition that it found to be consistent with the statute's purpose: "a noticeably or measurably large amount."  Id. at 19. Finding that "[i]t is difficult to discern the logic in the Service's conclusion that three large geographical areas, which comprise three-quarters of the Lynx's historical [habitat in the contiguous United States], are not a 'noticeably or measurably large amount of the species' range," the Court held that FWS had indeed violated the APA.  See id. at 21 (internal citation omitted).  This conclusion comported with a persuasive case from the Ninth Circuit in which the court

interpreted the ESA to mean that a "species could be 'extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was.'" Id. at 20 (quoting Defenders of Wildlife v. Norton, 258 F.3d 1136, 1145 (9th Cir. 2001).

The Court set aside the Lynx Final Rule, remanded the case "for reconsideration and explanation," and ordered the Service, at a minimum, to "explain its conclusion that the area in which the Lynx can no longer live is 'not a significant portion of its range.'" Id. (internal citation omitted).

### 3.    **The instant litigation**

Following the Court's remand, FWS published a Notice in the Federal Register on March 17, 2003 indicating that it was "opening a comment period on the contiguous United States [DPS] of the Canada Lynx" pursuant to the Court's Order.  68 Fed. Reg. 12611 (Mar. 17, 2003).  The Service indicated that it was "re-evaluating the determination that 'collectively the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the [L]ynx DPS."  Id.  It invited public comments on the quality of [L]ynx habitat," the "quantity of [L]ynx habitat," and "other elements concerning the significant portion of the range of the [L]ynx."  Id. at 12612.  The Service further stated that it would examine "information that had become available since" the Lynx Final Rule was published in 2000, including new research on

the historical occurrence of the species, as well as its current status, in the Northeast, Great Lakes, and Southern Rockies.  Id.

The comment period lasted through April 2003, during which time FWS received 118 comments from a variety of sources and covering a "broad spectrum of Lynx-related issues." 68 Fed. Reg. 40080 (July 3, 2003).  FWS published a "Notice of Remanded Determination of Status for the Contiguous United States Distinct Population Segment of the Canada Lynx" (the "Remanded Determination") on July 3, 2003.  See id. at 40076.  The twenty-five page Notice concluded with numerous findings including, most notably for purposes of this case, that

> the contiguous United States DPS of [L]ynx is not in
> danger of extinction throughout a significant portion of
> its range within the Northeast, Great Lakes, or Southern
> Rockies and therefore does not warrant reclassification
> to 'endangered' status in all or a significant portion of
> its range within these areas.

Id. at 40101.  As a result, the Service's 2000 listing of the Lynx as "threatened" remained intact.

As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g), Plaintiffs informed Defendants that they intended to seek judicial review of the Remanded Determination by letter dated March 11, 2004.  They noted there, and argue in their instant Motion, that the remanded determination "never squarely answers the specific issue remanded by the Court" and that "even the 'new' evidence discussed in the finding underscores the tenuous status of the Lynx throughout . . . its range in the U.S."

Plaintiffs filed the instant Complaint on July 20, 2004. With respect to their Lynx claim, they ask the Court (1) to declare that the Service's July 3, 2003 Remanded Determination violates the ESA and the APA; and (2) to set aside and remand that Determination to FWS for additional consideration. See First Am. Compl. at 48.

## C.   Plaintiffs' Challenge to the Counterpart Regulations

### 1.   The "Healthy Forests Initiative"

After the severe summer wildfire season of 2000, President William J. Clinton directed Interior and USDA to develop new strategies for reducing the risk of wildfires on national forest and parklands. See 68 Fed. Reg. 68255 (Dec. 8, 2003). Accordingly, on September 8, 2000, the Departments issued a report titled "Managing the Impact of Wildfires on Communities and the Environment." According to Defendants, the strategies contained in that report, together with its budget requests and directives, comprise a "National Fire Plan," ("NFP") that is a comprehensive, interagency effort designed to "reduce risk to communities and natural resources from wildland fires." See Defs.' Statement of Material Facts § 13.

Following another season of severe wildfires, President George W. Bush announced his "Healthy Forests Initiative" in a speech delivered August 22, 2002. According to a policy document that accompanied the President's speech, the Initiative would "accelerate implementation of the fuels reduction . . . goals of

-14-

the NFP" by substantially increasing the number of acres of national forestland "treated," or thinned, each year.  See 68 Fed. Reg. 68255 (Dec. 8, 2003).  A significant part of that effort would involve "reducing unnecessary regulatory obstacles," to the prompt approval of NFP projects.  See id.

### 2.   The Counterpart Regulations

On June 5, 2003, Interior, Commerce, FWS, the National Marine Fisheries Service ("NMFS"), and several additional agencies published a Proposed Rule in the Federal Register.  See 69 Fed. Reg. 33806 (June 5, 2003).  It explained that as part of President Bush's Healthy Forests Initiative, the agencies intended to adopt "Counterpart Regulations" that would "provide an optional alternative to the existing [ESA] Section 7 consultation process" for "projects that support the NFP."  Id.  The agencies claimed that the default Section 7 procedures require extensive and time-consuming interagency consultation even on "projects that had only insignificant or beneficial effects on listed species."  Id. at 3308.  The proposed procedures, by contrast, would "reduce delays" on fire management projects by "eliminating the requirement for written concurrences [from FWS or NMFS] for actions within the scope of" the NFP.  Id.

Under the proposed regulations, a federal Action Agency would be able to enter into an "Alternative Consultation Agreement" ("ACA") with FWS, NMFS, or both.  The ACA would include, inter

alia: (1) a list of the staff members within the Action Agency who
would have the authority to make a determination that proposed
projects are "not likely to adversely affect" ("NLAA") a listed
species and therefore do not require formal consultation under
Section 7; (2) a program for training those staff members to make
NLAA determinations; and (3) a program by which FWS or NMFS would
periodically monitor the Action Agency's actions under the
Counterpart Regulations.  See id. at 33809.

An Action Agency working pursuant to an ACA could make an NLAA
determination, and proceed on its proposed action, without
undertaking informal consultation with the relevant Service, and
without receiving a written NLAA concurrence from that Service.
If, however, the Action Agency makes a determination that the
action is likely to have an adverse impact, the default requirement
for formal consultation with one of the Services would apply.

On September 30, 2003, the FWS and NMFS issued a six-page
Environmental Assessment ("EA") to accompany the proposed
Counterpart Regulations.  The EA stated that FWS and NMFS believed
that Action Agencies working under an ACA would "reach the same
NLAA determination that [FWS or NMFS] would reach" if either were
consulted on any given project.  See Counterpart Regulations Admin.
R. Vol. 4 at G180.  Because FWS and NMFS determined that adoption
of the Counterpart Regulations would have no appreciable
environmental impact, they concluded that issuance of the EA

-16-

satisfied their duties under NEPA and that the preparation of a more detailed Environmental Impact Statement was unnecessary.  Id.

The relevant agencies promulgated a Final Rule adopting the Counterpart Regulations on December 8, 2003 after receiving over 50,000 comments.  See 68 Fed. Reg. 68254 (Dec. 8, 2003).  As codified, the Counterpart Regulations are virtually identical to those proposed in June 2003.  See 50 C.F.R. §§ 402.30-.34.

### 3.  The instant litigation

As noted supra, Plaintiffs filed this case on July 22, 2004. With respect to the Counterpart Regulations,[4] Plaintiffs seek a declaratory judgment that the Regulations violate the ESA, APA, and NEPA and an Order setting aside and remanding them to the agencies. See First Am. Compl. at 48.  Defendants answered on December 13, 2004 and filed the substantial Administrative Record for this case on February 11, 2005.  The instant Motions – Plaintiffs' Motion for Summary Judgement [Dkt. No. 36] and Defendants' Cross Motion for Summary Judgment [Dkt. No. 39] – were filed on May 3, 2005 and June 3, 2005, respectively.

## II.  STANDARD OF REVIEW

Summary judgment will be granted when the pleadings,

---

[4]    Throughout their briefs, Plaintiffs describe the regulations at issue as the "Self-Consultation Regulations."  While that term has a certain intuitive appeal, the Court will use their official name, the "Joint Counterpart Regulations" or "Counterpart Regulations."  See 50 C.F.R. §§ 402.30-.34.

depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Washington Post Co. v. U.S. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).  Ultimately, a court must determine "whether the evidence presents a sufficient disagreement . . . or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52. "If material facts are susceptible to divergent inferences, summary judgment is not available."  Coward v. ADT Sec. Sys. Inc., 194 F.3d 155, 158 (D.C. Cir. 1999).

Plaintiffs bring this case under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and under the APA, 5 U.S.C. § 706(2)(A).  The APA's deferential standard of review authorizes a court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law" or "without observance of procedure required by law." See 5 U.S.C. § 706(2)(A). Courts may not substitute their judgment for that of the agency, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), and must limit the scope of their review to the administrative record. See Camp v. Pitts, 411 U.S. 138, 142 (1973). A court's role is to ensure that the agency's decision is based on relevant factors and not a "clear error of judgment." Id. If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld." Small Refiner Lead Phase-Down Task Force v. E.P.A., 705 F.2d 506, 521 (D.C. Cir. 1983) (citation omitted).

In exercising its narrowly-defined review, a court must consider whether the agency acted within the scope of its legal authority, based its decision on facts in the record, considered the relevant factors, and adequately explained its decision. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989); Citizens to Preserve Overton Park, 401 U.S. at 415; Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1220 (D.C. Cir. 1983).

The deference a court must accord is not unlimited, however. For example, the presumption of agency expertise may be rebutted if its decisions are not reasoned. See ALLTEL Corp. v. F.C.C., 838 F.2d 551, 562 (D.C. Cir. 1988). Where an agency fails to

articulate "a rational connection between the facts found and the choice made," <u>Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, et al.</u>, 462 U.S. 87, 88 (1983), the Court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" <u>Dithiocarbamate Task Force v. E.P.A.</u>, 98 F.3d 1394, 1401 (D.C. Cir. 1996) (quoting <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)).  If an agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making. <u>See</u>, <u>e.g.</u>, <u>Association of Civilian Technicians v. Federal Labor Relations Auth.</u>, 370 F.3d 1214 (D.C. Cir. 2004); <u>Carlton v. Babbitt</u>, 900 F.Supp. 526, 533 (D.D.C. 1995).

## III. ANALYSIS

### A.   Plaintiffs' Canada Lynx Claim

#### 1.   Plaintiffs have standing to challenge the Lynx Remanded Determination

As noted above, Lynx-related litigation has been before this Court for nearly a decade and this is the Court's fourth Memorandum Opinion regarding the Lynx listing.  With one exception, the Plaintiffs litigating this case have participated in every previous Lynx case the Court has considered.[5]  For the first time, however, the Government now contends that Plaintiffs do not have standing to

---

[5]   The American Lands Alliance did not participate in the original Lynx case.

bring this suit.[6]

Plaintiffs claim that they have "concrete interests in Lynx survival and recovery" and have produced several affidavits demonstrating those interests. <u>See</u> Pls.' Mot. for Summ. J. at 7. While Defendants concede that Plaintiffs' "numerous affidavits show that [they] have 'recreational, aesthetic, and professional interests' in the Lynx," they argue that Plaintiffs nevertheless lack standing because they cannot establish any actual or imminent injury. Defs.' Reply at 1-2. In brief, Defendants maintain that because "FWS regulations extend to threatened species virtually all of the protections of endangered species," Plaintiffs cannot establish that they suffered any particularized injury arising out of the Service's determination that "the [L]ynx 'does not warrant reclassification to endangered in all or a significant portion of its range'" but should instead remain listed as threatened. Defs.' Mot. for Summ. J. at 17.

According to Plaintiffs, there are substantive differences in the protections afforded species that are listed as "endangered" rather than "threatened." <u>See</u> Pls.' Opp'n and Reply at 7. They claim that a decision by FWS to list the Lynx as "endangered,"

_____

[6]     Because standing is a component of the constitutional requirement of justiciability, Defendants' failure to raise the issue in earlier cases does not preclude them from doing so now. It is notable, however, that despite having three previous opportunities, the Government has never suggested that Plaintiffs do not have standing to challenge its decisions regarding the Lynx's status under the ESA.

rather than maintain its "threatened" status, would have several concrete effects, including the preservation of larger areas of critical habitat in order to ensure that the species can "recover." Id. at 8. As a result, they claim to have been injured by the Remanded Determination.

Article III limits federal jurisdiction to actual cases and controversies, and "[t]hree inter-related judicial doctrines—standing, mootness, and ripeness-ensure that federal courts assert jurisdiction only over" such disputes. Worth v. Jackson, 451 F.3d 854, 855 (D.C. Cir. 2005). Standing is therefore one of the bedrock requirements any litigant seeking relief in federal court must satisfy. See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982). The "irreducible constitutional minimum" of standing requires plaintiffs to demonstrate that they have suffered an "injury in fact" that is "caused by the challenged conduct and redressable through relief sought from the court." Shays et al. v. F.E.C., 414 F.3d 76, 83 (D.C. Cir. 2005).

The first element of standing, "injury-in-fact," requires a plaintiff to allege a concrete, imminent, and particular injury that is neither speculative nor generalized. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To meet the second requirement, causation, plaintiffs must establish that there is a "fairly traceable" causal connection between the injury

complained of and the Defendant's conduct.  See id.  The third and final element, redressability, requires a showing that it is "'likely,' as opposed to merely 'speculative,'" that favorable judicial action will redress any harm Plaintiff has suffered.  Id. at 561 (internal citation omitted); see also The Wilderness Soc'y v. Norton, 434 F.3d 584, 590 (D.C. Cir. 2006).

The Court concludes that FWS's decision to maintain the Lynx's status as "threatened," rather than designate it as "endangered," caused concrete and particularized injury to Plaintiffs' interests in the species, therefore giving them standing, in at least three ways.  First, the ESA prohibits the taking, importation, or export of an endangered species, but merely permits agencies—in their discretion—to enforce those same prohibitions as to threatened species.  See 16 U.S.C. § 1533(d). The statute makes a facial distinction between the two designations and mandates greater protections for endangered species.  Accordingly, FWS's decision to maintain the Lynx's "threatened" status excludes the species from the full range of mandatory ESA protections.

Second, while FWS does currently extend to threatened species the majority of ESA protections normally reserved for endangered ones, not all such protections have been extended.  See 50 C.F.R. § 17.31.  To cite one example, state conservation agency officials may take endangered species only under certain limited conditions; by contrast, far fewer limits are placed on the ability of those

officials to take threatened species.  See id. § 17.21(c)(5).  In addition, the Service could change course at any time, change its Regulations, and cease extending to threatened species those protections that are not specifically mandated by the ESA.

Third, and finally, Defendants concede that there is at least one important distinction between endangered and threatened species: the Services designate, and therefore preserve, larger areas of critical habitat for the former than they do for the latter.  See Defs.' Reply at 4.  As a result, Plaintiffs are correct that the designation of the Lynx as endangered rather than threatened would "have a significant bearing on the amount of 'critical habitat' that must be protected" in order to ensure the survival of the species.  Pls.' Opp'n and Reply at 7.

Given these important differences in the status of, and legal protections accorded to, endangered and threatened species, there can be no real question that Plaintiffs, who have cognizable interests in the Lynx and its habitat, have been injured by FWS's determination that the species should remain listed as threatened. They therefore have standing to challenge that determination on the merits.[7]

> ## 2.   The Remanded Determination of the Lynx's Status Violates the Court's 2002 Order Because FWS Failed to Squarely Address the Issue Remanded to It

_____

[7]   The Court need not address causation or redressability because those elements of standing are not in dispute.

Plaintiffs argue that the Remanded Determination "fail[s] to address the specific issue remanded by the Court," namely whether "[c]ollectively the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion" of the lynx's range in the contiguous United States.  Pls.' Mot. for Summ. J. at 36.  Instead, they claim, "defendants took it upon themselves to resolve a different issue entirely – whether the [l]ynx is 'in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, and Southern Rockies.'"  Pls.' Opp'n and Reply at 25.  According to Plaintiffs, it was not within FWS's discretion to consider that issue on remand, and, even if it had been, the Service failed to do so properly.[8]

---

[8]  Specifically, Plaintiffs argue that FWS failed to solicit public comments on whether the Lynx is in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, and Southern Rockies.  Because the Court holds that Defendants did not squarely address the specific issue that was remanded to it, necessitating yet another remand for further proceedings, it is not necessary to address the adequacy of the notice and comment procedures followed in FWS's consideration of the alternative issue.

The Court notes, however, that at least one FWS employee, Randal Bowman, indicated in a March 2003 email that he shared many of Plaintiffs' concerns regarding the sufficiency of the notice and comment process.  See Lynx Remand Admin. R. at 2659 (Mar. 3, 2003 email from Randal Bowman)("I have serious concerns with . . . respect to what we are asking in the way of public comment . . . It is not at all clear to me . . . how our considering only quality and quantity of lynx habitat, and requesting comment only on these factors and on data we have posted on the internet, allows us or the public to provide meaningful comment on the question of whether 3 of the 4 regions within the DPS constitute a significant portion of the lynx's range, as required by the court.").

Defendants concede that the Remanded Determination does not "attempt[] to defend the determination that the Court had found to be 'counterintuitive and contrary to the plain meaning of the ESA.'" Defs.' Cross Mot. for Summ. J. and Opp'n. Instead, they argue that FWS properly decided to "take an alternative approach" and "go beyond the narrow issue that was specifically raised by the Court." See id. at 30-31. Accordingly, FWS "reconsidered the listing rule" in its entirety. Id. at 29. The issue is whether FWS's Remanded Determination satisfies the Court's Order.

An administrative agency ordered to reconsider or explain a prior decision retains some discretion to determine how it "may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops." Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 333-34 (1976). A court may not dictate to the agency the "methods, procedures, [or] time dimension," for its reconsideration. SEC v. Chenery Corp., 318 U.S. 194, 196 (1947). Nor may a court demand that an agency reach a particular result. See id.; see also Nat'l Tank Truck Carriers v. E.P.A., 907 F.2d 177, 185 (D.C. Cir. 1990) ("We will not, indeed we cannot, dictate to the agency what course it must ultimately take.").

Nevertheless, an agency faced with a remand order has an affirmative duty to respond to the specific issues remanded. See, e.g., Tex Tin Corp. v. E.P.A., 992 F.2d 353, 355 (D.C. Cir.

1993)(holding that the agency violated its remand order by failing to explain the specific issue remanded); Association of Civilian Technicians v. Federal Labor Relations Auth., 370 F.3d 1214, 1223 (D.C. Cir. 2004) (ordering a second remand because the agency failed to address adequately the issues remanded in the first instance).  A court retains jurisdiction to enforce the terms of its remand order when an agency fails to meet them.  See International Union, United Auto., Aerospace, & Agric. Implement Workers of America, U.A.W. v. O.S.H.A., 976 F.2d 749, 750 (D.C. Cir. 1993).

The Court's instructions in its December 2002 Memorandum Opinion and Order were clear and unambiguous.  Because it found FWS's determination that "collectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the [United States] DPS" to be arbitrary and capricious, it ordered the agency "[a]t a minimum, [to] explain such an interpretation that appears to conflict with the plain meaning of the phrase 'significant portion.'" Defenders of Wildlife, 239 F. Supp. 2d at 19 (emphasis added).  Asking the same question in a slightly different way, the Court further instructed FWS to, "explain [its] conclusion that the area in which the [Lynx] can no longer live is not a significant portion of its range." Id. at 21 (emphasis added)(internal citation and quotation omitted).

There can be no question that the agency's primary duty on

remand was to explain its earlier finding that the Court held to be inconsistent with the ESA: that the Northeast, Great Lakes, and Southern Rockies, three of the four regions that the Lynx has historically populated, do not "collectively" constitute a "significant portion" of the animal's total range within the contiguous United States.  Nevertheless, in the course of a twenty-five page Remanded Determination, FWS presents no coherent explanation for that finding.  Instead, FWS addresses an issue that is both conceptually and semantically distinct from the one remanded: whether the Lynx is in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, and Southern Rockies.

The Court asked FWS to explain how three-fourths of what it had previously identified as the Lynx's total range in the contiguous United States could not be "significant."[9]  Instead, FWS

---

[9]  The Court notes that FWS did include some discussion of the term "significant" in the Remanded Determination.  That discussion, however, is wholly unsatisfactory.  The Court previously found that FWS's use of the term was inconsistent with the language and purpose of the ESA and thus was an invalid exercise of statutory interpretation.  See Defenders of Wildlife, 239 F. Supp. 2d at 20.  On remand, the Service once again defined "'significant' to mean 'important'" rather than "noticeably or measurably large," as the Court had defined the term.  See 68 Fed. Reg. at 40076-77 (July 3, 2003).  For the reasons it stated in 2002, the Court continues to find the agency's definition unpersuasive.  Because this is not a case where deference is due to the Agency's interpretation, moreover, the Court need not and does not accept it.  See International Longshoreman's Ass'n, AFL-CIO v. National Mediation Bd., 870 F.2d 733, 736 (D.C. Cir. 1989)(holding that no deference is owed to an agency when it "fail[s] to apply an important term of its governing statute").

chose to address the Lynx's status within those discrete areas, and to present a different rationale for its final justification in the remand of its listing decision.[10]  While FWS retained the discretion to determine "how its prior decision should be modified in light of such evidence as develops," Transcontinental Gas Pipeline Corp., 423 U.S. at 333-34, it may not ignore the Court's order for an explanation of an important finding in that prior decision, especially when the explanation (or even the modification or rejection of that explanation) may be relevant to the new rationale it is offering for that decision.

---

[10]  The administrative record makes clear that FWS employees appreciated their duty to the Court and understood the specific issue that had been remanded.  See, e.g., Lynx Remand Admin. R. at 6 (January 21, 2003 email from Ron Refsnider)("We'll need to re-examine the Lynx 'range' and decide if any of the 4 areas – alone or in combination – constitute a significant portion of its range."); id. at 166 (April 3, 2003 "Briefing Statement")("In the remand we need to clearly explain how we define the historic and current range of the Lynx . . . and dispel the Judge's perception that the range historically was much more extensive.)"; and id. at 870 (May 20, 2003 email from Susan Wilkinson)("The 'significant portion of the range' part is part of the legal definition . . . that the Judge in this case specifically wanted us to focus on.").

The record also demonstrates that at least some FWS employees feared that the Remanded Determination was not responsive to the Court's order.  See, e.g., id. at 870 (May 20, 2003 email from Susan Wilkinson)("I think we are coming to the same conclusion as before but for a different reason."); id. at 1618 (June 19, 2003 email from Lori Nordstrom)("I am still concerned that this new direction on the Lynx remand is not what the judge ordered."); and id. at 1520 (June 19, 2003 email from Lori Nordstrom)("I don't have a lot to add to the D[istinct] P[opulation] S[egment] discussion so I'm wondering if maybe we should just bag it for this remand and wait till [sic] the judge tells us to do it again (disappointed sigh).").

Where, as here, an agency has utterly failed to abide by the terms of a remand order, a second remand is the only appropriate remedy.  Our Court of Appeals addressed a similar factual scenario, and reached the same conclusion, in Tex Tin Corp. v. E.P.A..  See Tex Tin Corp. v. E.P.A., 992 F.2d 353 (D.C. Cir. 1993).  In that case, the Court criticized the Environmental Protection Agency's ("EPA") analysis underlying its decision to list a hazardous waste site as a "national priority site" under the federal "Superfund" statute.  See id. at 354.  Specifically, it found fault with EPA's explanation of its conclusion that "arsenic [present at the site] is reasonably likely to be transported via the air route."  Id.  It thus remanded the decision to the agency "for a reasoned explanation of [that] conclusion."  Id.

On remand EPA again listed the site on the Superfund list, this time offering a new rationale, but did not squarely address the specific issue that was remanded.  See id. at 355.  The Court of Appeals found that the new information provided was "not responsive to [its] remand order," and that "[i]t is too late for the Agency to base its [decision] on a new theory."  Id.  On that basis, the Court remanded the case for a second time, and in fact ordered EPA to take the site off the Superfund list.

While Defendants and Intervenors attempt to draw distinctions between Tex Tin and this case, the Court finds their efforts unpersuasive.  See Defs.' Reply at 16-17; Intervenors' Reply at 20-

-30-

21.  Here, as in <u>Tex Tin</u>, the Court ordered an agency to explain on remand a specific technical finding that supported an action taken pursuant to the statute it administers.  Likewise, both here and in <u>Tex Tin</u>, the agency reached the same substantive determination on remand, presented a new rationale, but neglected to address the specific issue that it had been ordered to explain.  Consequently, the Court will order the same remedy the Court of Appeals adopted in <u>Tex Tin</u>.

The case will again be remanded to FWS so that it may clearly and specifically address the finding it was ordered to explain three years ago: that "[c]ollectively the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the [Lynx] DPS."  Given the lengthy delay in all the proceedings regarding the Lynx listing, the Court expects and hopes that FWS can accomplish its task within 90 days.[11]

## B.   Plaintiffs' Challenge to the Counterpart Regulations

Plaintiffs attack the Counterpart Regulations as invalid under the ESA, APA, and NEPA and seek summary judgment on three grounds.  First, they allege that the Regulations violate ESA § 7 by unlawfully enabling Action Agencies such as the BLM or the USFS to bypass their interagency consultation requirements when considering NFP projects.   <u>See</u> Pls.' Mot. for Summ. J. at 42.   Second,

---

[11]  The Court must accept responsibility for part of that delay as the instant Motions have been ripe for well over a year.

Plaintiffs argue that Defendants acted arbitrarily and capriciously, in violation of the APA, by failing to articulate a reasonable explanation of the rationale underlying the Regulations or the evidence supporting them. Third, and finally, they contend that Defendants violated NEPA by promulgating the Regulations after performing an Environmental Assessment when, under the statute, a more comprehensive Environmental Impact Statement should have been developed. See id. at 59.

In addition to arguing that the Regulations are valid on the merits, Defendants challenge Plaintiffs' standing to bring this claim.[12] See Defs.' Mot. for Summ. J. at 15. As a threshold

_____

[12] Defendants also challenge Plaintiffs' claim on ripeness grounds. See Defs.' Cross Mot. for Summ. J. and Opp'n at 25-26. Because this argument has so little merit, the Court will address it summarily.

The purpose of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149 (1967). Specifically, courts look to three factors to determine whether a case is ripe: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

This case is ripe for three reasons. First, given the ongoing threats to the survival of the Lynx, there is no question that further delay in this already two-year-old case would cause hardship to Plaintiffs. Second, while the Counterpart Regulations are relatively new, FWS published the Final Rule establishing them

matter, therefore, the Court must first consider the standing issue.  See id. at 16, 25.

### 1. Plaintiffs have standing to challenge the Counterpart Regulations

Defendants offer numerous arguments to support their position that Plaintiffs do not have standing to challenge the Counterpart Regulations.  Ultimately, however, it is their characterization of Plaintiffs' claims as "broad, vague, and speculative" that drives Defendants' standing challenge.  See Defs.' Mot. for Summ. J. at 22.  Apart from "pure speculation that the use of the counterpart regulations will increase the risk of some general harm to their interests," Defendants argue, Plaintiffs fail to demonstrate that they have suffered any real injury.  Id.  According to Defendants, it is not enough for Plaintiffs to simply state that they "generally disagree with the counterpart consultation procedures." Defs.' Reply at 6.   To establish standing, they must instead demonstrate that the Counterpart Regulations have caused them to suffer a concrete, "personal[,] and particularized injury."  See Defs.' Mot. for Summ. J. at 23.

Plaintiffs assert that they have indeed suffered a

---

nearly three years ago.  Therefore, judicial intervention at this point would not inappropriately interfere with the formulation of agency policies.  Third, and finally, the Counterpart Regulations have been applied at least fourteen times in areas affecting Plaintiffs' interests, and therefore judicial review can be accomplished without further factual development.  See Pls.' Opp'n and Reply at 21.

particularized injury, albeit of a procedural nature.   In their

view, by allowing Action Agencies to bypass the Section 7

interagency consultation requirements in certain circumstances, the

Counterpart Regulations "represent[] a wholesale departure from

'established procedures' ordained by Congress" to protect their

"documented interest in [Lynx] habitats."  Pls.' Opp'n and Reply at

16.  This procedural injury, they contend, is sufficient in itself

to confer standing.  See id. at 17.

     The principal elements required to establish standing are

outlined above and need not be repeated.   Because the injury

Plaintiffs claim to have suffered is procedural in nature, a

slightly different analysis applies.  In procedural injury cases,

the plaintiff can establish standing "without meeting all the

normal standards for redressibility and immediacy." Lujan, 504 at

573 n.7.  Instead, she must merely demonstrate that she is "seeking

to enforce a procedural requirement, the disregard of which could

impair a separate concrete interest of [hers]."   Id. at 572.  Our

Court of Appeals has formulated a two-part test to guide this

analysis.  The plaintiff must show, first, "that the defendant's

acts omitted some procedural requirement," and, second, "that it is

substantially probable that the procedural breach will cause [an]

essential injury to the plaintiff's own interest." Florida Audubon

Soc'y v. Bentsen, 94 F.3d 658, 665 (D.C. Cir. 1996).

     A plaintiff alleging procedural injury, however, "never has to

prove that if he had received the procedure the substantive result would be different." Sugar Cane Growers Coop. v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002). "All that is necessary is to show that the procedural step was connected to the substantive result." Id. In other words, the plaintiff need not "demonstrate that (1) the agency action would have been different but for the procedural violation, [or] (2) that court-ordered compliance with the procedure would alter the final result." National Parks Conservation Assoc. v. Manson, 414 F.3d 1, 5 (D.C. Cir. 2005).

        Applying these principles to the facts of this case, the Court concludes that Plaintiffs have demonstrated their standing to challenge the Counterpart Regulations. There is no dispute that Plaintiffs' aesthetic, recreational, and professional interests in the Lynx and its habitat are cognizable. See Sierra Club v. Morton, 405 U.S. 727 (1972). There is also no dispute that, pursuant to the Counterpart Regulations, the Action Agencies have already made a number of NLAA determinations on National Fire Plan projects in areas inhabited by the Lynx without engaging in the default Section 7 procedures. What is at issue here is whether there is a causal connection between the omission of such consultation and the injuries Plaintiffs allege.[13]

---

[13] The Court notes that for purposes of determining standing, it is the strength of Plaintiffs' allegations of injury that is of primary concern. Whether their substantive legal arguments are ultimately persuasive is not relevant to this analysis.

Without question, Plaintiffs' affiants have demonstrated that they have "concrete interests in Lynx survival and recovery" in areas that have been subject to NLAA determinations under the Counterpart Regulations.  See Pls.' Mot. for Summ. J. at 7.  To take but three examples, affiant Bruce Pendery states that

> several areas I regularly use have already been impacted by projects that have gone forward absent the review by the FWS mandated by the ESA.  For example, in the Buffalo Ranger District of the Bridger Teton National Forest—an area that I used for recreation, including cross country skiing—the Forest Service "self consulted" under the Counterpart Regulations on the potential impacts on Lynx of the Hathcet-Blackrock Fuels Reduction Project, which will consist of mechanical "thinning" of 300 acres, 231 of which are considered Lynx habitat. . . [T]he action agency determined that the projects were "not likely to adversely affect" the Lynx despite potential negative effects . . . on the species and its habitat.  For example, the thinning and logging operations will harm Lynx by removing suitable habitat. . . .

Pendery Decl. ¶¶ 15-16.

> Likewise, affiant Suzanne Stone explains that

> several areas I regularly use have already been impacted by projects that have gone forward absent the review by the FWS mandated by the ESA.  For example, the Whitehawk basin . . . is especially important to me because it is one of my and my family's favorite places to visit.  The Forest Service, however, recently approved the Whitehawk Whitebark Pine Restoration Project . . . and used the Counterpart Regulations to make a[n NLAA] determination . . . It is my view that [these] large-scale thinning and logging operations will harm Lynx by removing and disturbing suitable habitat, and will impair my interests in this area.

Stone Decl. ¶¶ 11-12.

> Finally, affiant Sara Mounsey alleges that

> [S]everal areas I regularly use have already been

> affected by a project called the 57 Bear Paws Fuel
> Reduction Project that was subject to "self-consultation"
> by the Forest Service[].  Although projects like this
> one—which involve logging and road building—may harm
> [L]ynx . . . the Forest Service found that the project
> was "not likely to adversely affect" the[] species . . .
> As a consequence of the FWS being eliminated from the
> process, opportunities to avoid or mitigate impacts on
> listed species have been lost. . . .

Mounsey Decl. ¶ 10.

Defendants characterize Plaintiffs' injuries as "premised on speculation and conjecture," Defs.' Cross Mot. for Summ. J. and Opp'n at 24, and argue that they have not, as required, "directly alleged that they have been harmed by any particular agency actions undertaken pursuant to the . . . [C]ounterpart [R]egulations." Reply at 8.  In addition to being factually inaccurate, this argument misstates Plaintiffs' burden at this stage of the proceedings.

To establish standing based on a procedural injury, Plaintiffs need not demonstrate that any particular agency action was incorrect or that a different substantive result would have been reached had the omitted procedure taken place.  See Sugar Cane Growers Coop., 289 F.3d at 94-95.  Instead, they need only show that Defendants "omitted some procedural requirement" and "that it is substantially probable" that such omission will "cause [an] essential injury to the plaintiff's . . . interest." Florida Audubon Soc'y, 94 F.3d at 665.  Plaintiffs have alleged, and Defendants have conceded, that the default procedures for Section

7 consultation were not applied to certain National Fire Plan
Projects in Lynx habitat.  Plaintiffs therefore have standing if it
is "substantially probable" that their interests were affected by
the lack of such consultation.

The Supreme Court has explained that while the Services
"theoretically serve[] an advisory function" when consulting with
Action Agencies pursuant to the ESA, they in fact exercise "a
powerful coercive effect."  Bennett v. Spear, 520 U.S. 154, 169
(1997).  Biological Opinions issued by the Services, the Court
explained, have a "virtually determinative effect" on the Action
Agencies' policies.  Id. at 170.  Furthermore, our Court of Appeals
has likewise noted that "expert agencies (such as [FWS] . . . and
[NMFS]) are far more knowledgeable than other federal agencies
about the precise conditions that pose a threat to listed species,"
and "are in the best position to make discretionary factual
determinations about whether a proposed agency action will create
a problem for a listed species and what measures might be
appropriate to protect the species."  City of Tacoma, Washington v.
Federal Energy Regulatory Comm'n, 2006 WL 2411362 at *18 (D.C. Cir.
2006).

The procedural requirement of Section 7 consultation was,
without question, designed to ensure protection of listed species
and Plaintiffs have established their particular interest in Lynx
recovery and survival.  Given the well-established expertise of the

Services, and the fact that consulting with them has a "virtually determinative effect" on the Action Agencies, it is at least "substantially probable" that the lack of consultation with the Services on National Fire Plan projects injured Plaintiffs' interests in the Lynx.  Plaintiffs are required to show no more to establish standing.  <u>See</u> <u>Florida Audubon Soc'y</u>, 94 F.3d at 665. Consequently, the Court must allow their challenge to the Counterpart Regulations to proceed.

> **2.    The Counterpart Regulations are valid because they are not an impermissible or unreasonable construction of the ESA, and because FWS considered the relevant data and articulated a satisfactory explanation for them**

> > **a.    The Counterpart Regulations are valid under ESA Section 7**

Plaintiffs argue that ESA Section 7 mandates consultation between the Action Agencies and the Services on each and every federal action that may affect a listed species.  <u>See</u> Pls.' Mot. for Summ. J. at 42-43.  Given the mandatory nature of this duty, they contend, the Counterpart Regulations "flagrantly violate[], [and] make[] a total mockery of, [S]ection 7(a)(2)'s express requirement for 'consultation' on 'any project' to 'insure' that listed species are not jeopardized or critical habitat is not impaired."  <u>Id.</u> at 43.

According to the Government, Section 7 does not "define the term 'consultation' nor . . . provide any direction or criteria as to how [consultation] is to be carried out.  Rather, that gap-

filling function is left to the informed discretion of the Services." Defs.' Cross Mot. for Summ. J. and Opp'n at 40. Furthermore, Defendants argue that "nowhere in the ESA did Congress specify that [the] consultation obligation can be fulfilled only by consulting with FWS or NMFS on each and every action as they are taken." Id. at 41. Consequently, Defendants contend that the Counterpart Regulations are a reasonable interpretation of the statute that must be upheld.

Because Plaintiffs challenge the Secretary's interpretation of a provision in the ESA, the Court proceeds according to the familiar two-step inquiry of Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Under the first step of Chevron, the reviewing court must ascertain the plain meaning of the statute. To that end, a court "must . . . determine whether Congress has spoken to the precise question at issue." Natural Res. Def. Council, Inc. v. Browner, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting Chevron, 467 U.S. at 843 n.9). A court must examine the text of the particular provision under examination, as well as its statutory context and purpose, in making that determination. See Consumer Electronics Ass'n v. Federal Commc'ns Comm'n, 347 F.3d 291, 297-99 (D.C. Cir. 2003); Am. Bankers Ass'n v. Nat'l Credit Union Admin., 271 F.3d 262, 265 (D.C. Cir. 2001); County of Los Angeles v. Shalala, 192 F.3d 1005, 1014 (D.C. Cir. 1999). If this search yields a clear result, then

Congress has expressed its intention as to the question at issue, and deference is not appropriate. See Qi-Zhuo v. Meissner, 70 F.3d 136, 140 (D.C. Cir. 1995) ("Where . . . the plain language of the statute is clear, the court generally will not inquire further into its meaning.").

If, however, "the statute is silent or ambiguous with respect to the specific issue" raised, Congress has not spoken clearly, and the court must proceed to the second step of Chevron. Chevron, 467 U.S. at 843. "A statute is considered ambiguous if it can be read more than one way." AFL-CIO v. Fed. Election Comm'n, 333 F.3d 168, 174 (D.C. Cir. 2003). In the second-step analysis, an agency interpretation of the statute that is permissible and reasonable merits judicial deference. Id. If the statute does not "forbid[] the Agency's interpretation," and if that interpretation does not "for other reasons, exceed[] the bounds of the permissible," it must be upheld. Barnhart v. Walton, 535 U.S. 212, 218 (2002).

While Plaintiffs argue that the first step of Chevron should govern the analysis here, there can be no question that this is not a step-one case. In relevant part, Section 7 provides that

> [e]ach federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . .

16 U.S.C. § 1536(a)(2). A definition of "consultation" is not provided in that Section, nor elsewhere in the ESA. Furthermore,

Section 7 is completely silent on both the mechanics and details of the "consultation" it requires.  Here, Congress has not "spoken to the precise question at issue," <u>Browner</u>, 57 F.3d at 1125, but has instead "left a gap for the agency to fill."  <u>Chevron</u>, 467 U.S. at 843.  Therefore, the Court must proceed to the second step of the <u>Chevron</u> analysis.

Administering a complex regulatory regime like that established in the ESA "necessarily requires the formulation of policy and the making of rules to fill in any gap left, implicitly or explicitly, by Congress."  <u>Id.</u>  Where a statute is subject to conflicting interpretations, <u>Chevron</u> step two requires the Court to defer to the Secretary's policy choices so long as they are reasonable and not clearly inconsistent with the statute.  <u>See</u> <u>Troy Corp. v. Browner</u>, 120 F.3d 277, 283-84 (D.C. Cir. 1997).

Plaintiffs argue that the Counterpart Regulations allow Action Agencies to "bypass" the Services entirely on any project within the National Fire Plan.  <u>See</u> Pls.' Mot. for Summ. J. at 43.  This simply is not the case.  Pursuant to the Regulations, an Action Agency must develop and implement an Alternative Consultation Agreement ("ACA") together with one or both of the Services before that Agency can be authorized to make NLAA determinations on National Fire Plan projects.  <u>See</u> 50 C.F.R. § 402.33.  The Agency and the Services must, <u>inter</u> <u>alia</u>: determine and identify who within the Agency will have authority to make such determinations;

set forth "the standards the Action Agency will apply in assessing" the potential effects of any proposed National Fireplan Project;" agree upon "a program for monitoring and periodic program evaluation;" and implement a "training program outlined in the ACA to the mutual satisfaction of the Action Agency and the Service." Id.

Through the periodic evaluation that the Regulations require, the Services must "determine," on an ongoing basis, that the Action Agency's "implementation" of the ACA is "consistent with . . . the ESA and section 7 regulations." Id. § 402.33(a). The Service Director may, as a result of her evaluations, "recommend changes to the Action Agency's implementation of the ACA." Id. § 402.33(b). Finally, the Services retain the power to suspend or terminate an ACA if the Action Agency "fails to comply with . . . section 7 of the ESA." Id. § 402.33(c).

The ESA language at issue requires "consultation" on projects that might affect a listed species, but leaves room for the Secretary to determine how, precisely, that consultation should occur.[14] Given the involvement of the Services in the creation of

---

[14] The statute's legislative history only confirms Congress' intent to give the Secretary discretion in administering the ESA. As Defendants point out, when Congress amended the statute in 1978, the House Report accompanying the bill stated that the amendments were designed, in part, to "introduce some flexibility into the Act." H.R. Rep. No. 95-1625; see also 124 Cong. Rec. 21,147 (1978) (statement of Senator John Chafee explaining that "[t]he new regulations published by [FWS] for section 7 recognize that

an ACA and the oversight they retain over Action Agencies working pursuant to one, as well as their power to suspend or terminate a poorly-administered ACA, the Services retain an important and ongoing role in evaluating the environmental consequences of National Fire Plan projects.  As a result, the Court cannot find that the Counterpart Regulations are inconsistent with the ESA's "consultation" requirement.[15]

Furthermore, Plaintiffs' position, if taken to its logical conclusion, would require the Court not only to overturn the Counterpart Regulations, but also to invalidate the very default Section 7 consultation procedures that have been in effect since 1978 on which Plaintiffs rely.  To repeat, Plaintiffs contend that

---

consultation procedures must be sufficiently flexible to accommodate the myriad of activities that are authorized, funded, or carried out by the Federal Government").

[15]   Plaintiffs note that a federal district court in the Western District of Washington recently vacated a different set of counterpart regulations issued by EPA in 2004, finding them inconsistent with the consultation requirement contained in Section 7.  See Washington Toxics Coalition v. United States Department of Interior, 2006 WL 2469119 (W.D. Wash. 2006).  While Washington Toxics Coalition and this case present similar issues, the Court finds it distinguishable for at least two reasons.  First, the plaintiffs in Washington Toxics Coalition challenged a completely different set of counterpart regulations, based on a very different administrative record, than the Regulations and record under review here.  Second, and more importantly, the court was compelled to reach its conclusion in Washington Toxics Coalition by Ninth Circuit precedent that is substantively different from the case law interpreting Chevron in this jurisdiction.  See id. at *11.  The prevailing law in the D.C. Circuit overwhelmingly supports the proposition that the Secretary's construction of ambiguous statutory language must stand so long as it is reasonable and permissible.

Section 7 requires consultation between the Action Agencies and the Services "on 'any project' to 'insure' that listed species are not jeopardized or critical habitat is not impaired." Pls.' Mot. for Summ. J. at 43. Pursuant to the default consultation regime, which Plaintiffs favor, however, only the Action Agencies are responsible for making an initial determination as to whether a proposed action "may affect listed species or critical habitat." 50 C.F.R. § 402.14. The Services play no role whatsoever in that threshold determination; if an Action Agency concludes that a proposed action will have no effect on a listed species, it is under no obligation to consult with the Services.

If Plaintiffs' interpretation of Section 7 is the correct one, this procedure would be invalid because it does not mandate consultation on each and every federal project.[16] However, because Congress reviewed the default consultation procedures in 1978, and passed ESA Amendments codifying them, the Court must conclude that Congress intended to allow Action Agencies to initially evaluate the potential environmental consequences of federal actions and to move forward on many of them without first consulting the Services if they concluded that they had "no effect" on listed species and their critical habitat. Plaintiffs' broad interpretation of the

---

[16] The Court notes that in response to the Government's argument on this point, Plaintiffs merely state that the validity of the default procedures "are not under review in this case" and that they "have not challenged those longstanding procedures." Pls.' Opp'n and Reply at 35. They offer no substantive rebuttal.

term "consultation" does not comport either with the plain meaning of the ESA or the legislative intent underlying it.   See 1978 U.S.C.C.A.N. at 9462.

Accordingly, the Court does not find that the Counterpart Regulations involve an unreasonable or impermissible interpretation of the term "consultation" as it is used in ESA Section 7.[17]

### b.   The Counterpart Regulations satisfy the APA

Arguing that "[D]efendants have failed to offer even a coherent and consistent explanation, let alone one that is supported by record evidence," Plaintiffs also challenge the Counterpart Regulations as invalid under the APA.  Pls.' Mot. for Summ. J. at 50.  The Government characterizes this argument as a "straw man" and maintains that in issuing the Counterpart Regulations, the Services and the Secretary built a record and offered a rationale that easily satisfies the APA standard.  See Defs.' Cross Mot. for Summ. J. and Opp'n at 50.

As noted above, the deferential standard of review embodied in

---

[17]   The Court shares many of Plaintiffs' concerns about the wisdom and efficacy of the Counterpart Regulations.   However, interpreting  terms in the ESA "involves . . . complex policy choice[s]."  See Sweet Home, 515 U.S. at 709.  Because Congress has "entrusted the Secretary with broad discretion" to administer the statute, the Court must be "especially reluctant to substitute [its] views of wise policy for his."  Id.   The Counterpart Regulations are reasonable and permissible under the ESA, and it is not the Court's role to second-guess the Secretary's considered judgment.

the APA limits a court's inquiry to determining whether agency's decision is based on relevant factors and not a "clear error of judgment." <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).  An agency satisfies this standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action," <u>State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43, and a court finds that there was "a rational connection between the facts found and the choice made." <u>Baltimore Gas & Elec. Co.</u>, 462 U.S. at 88.

The relevant agencies developed the Counterpart Regulations over a period of nearly twelve months and there is no dispute that they complied with the APA's procedural requirements in doing so. They received more than 50,000 comments on the Proposed Rule, including comments from several environmental conservation organizations, and gave detailed responses to many of them in the Final Rule.  <u>See</u> <u>id.</u> at 68257-60.

Furthermore, a clear rationale, that the Government has consistently articulated, underlies the Counterpart Regulations. That rationale can be summarized roughly as follows.  The Services and the Secretary determined that the default Section 7 consultation procedures contain overlapping requirements, and other inefficiencies, that often cause "unnecessary delay" in the approval of National Fire Plan projects.  <u>See</u> 68 Fed. Reg. 68254. Because the number of severe wildfires in national forests has increased dramatically in recent years—in 2002 alone there were

88,000 such fires—time is of the essence in reviewing projects that would "treat" forestland at risk of catching fire.  Id.  The Counterpart Regulations, which streamline the approval process for National Fire Plan Projects, allow Action Agencies to "accelerate the rate at which these types of activities can be implemented so that the likelihood of catastrophic wildland fires is reduced" while also meeting their statutory duties under the ESA.  Id. at 68255.

In light of this evidence, there is no basis on which the Court could conclude that the agencies failed to "consider the relevant data and articulate a satisfactory explanation for its action."  State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.  It is not for the Court to decide whether the Counterpart Regulations represent wise "substantive policymaking."  Continental Airlines Inc. v. Department of Transp., 843 F.2d 1444, 1451 (D.C. Cir. 1988).  The Court's only role is to determine whether there is a rational connection between the facts found and the choices made during the rulemaking.  There is.  As a result, Plaintiffs' APA challenge to the Counterpart Regulations must fail.

> **c.  Defendants complied with NEPA in promulgating the Counterpart Regulations**

The final basis for Plaintiffs' challenge to the Counterpart Regulations is NEPA.  According to Plaintiffs, Defendants chose to issue the Regulations with an Environmental Assessment ("EA"),

rather than a more comprehensive Environmental Impact Statement ("EIS"), thereby ignoring "the views of FWS's own Regional directors . . . who pointed to a multitude of ways in which . . . [the Regulations] will undoubtedly have 'environmental effects,' including serious adverse impacts on listed species and their habitats." Pls.' Mot. for Summ. J. at 59. Furthermore, Plaintiffs argue, allowing these Regulations to issue with an EA rather than an EIS, will establish a dangerous precedent for other agencies to follow. Id. at 50-60.

As discussed above, our Circuit requires courts to consider four factors in evaluating whether an agency has properly concluded that the preparation of an EIS is not necessary: "(1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced that impact to a minimum." Hodel, 840 F.2d at 61-62. This Court's review is limited because, as our Court of Appeals has explained, "NEPA's 'mandate to the agencies is essentially procedural. It is to insure a fully informed and well-considered decision, not necessarily a decision [federal judges] would have reached had they been members of the decisionmaking unit of the agency.'" National

Audubon Soc'y v. Hester, 801 F.2d 405, 408 (quoting Vermont Yankee Nuclear Power Co. v. NRDC, 435 U.S. 519, 558 (1978)).

Applying this deferential test, the Court concludes that Defendants satisfied NEPA.  The administrative record demonstrates that Defendants considered comments suggesting that the environmental impact of the Regulations could be grave, including comments from some of FWS's Regional Directors.  See Admin. R. Vol. 6.  The record also illustrates that Defendants made detailed and reasonable responses to those comments.  Id.  Accordingly, Defendants identified the relevant areas of environmental concern and the Court cannot conclude that they failed to take a "hard look" at those areas.  Furthermore, because, as discussed above, the Services retain an ongoing role in evaluating the impact of NLAA determinations by the Action Agencies, it was reasonable for Defendants to find that, as compared to the default Section 7 consultation regime, the overall environmental impact of the Counterpart Regulations will be insignificant.  Finally, Defendants correctly point out that the decision to issue an EA, rather than an EIS, creates no binding precedent for other agencies to follow. Town of Cave Creek, Arizona v. F.A.A., 325 F.3d 320, 332 (D.C. Cir. 2003).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is hereby **granted in part and denied in part** and Defendant's Cross Motion for Summary Judgment is hereby **granted in part and denied in part.**

An Order will issue with this Memorandum Opinion.


September 29, 2006                    /s/_____
                                     Gladys Kessler
                                     United States District Judge



**Copies to**: **attorneys on record via ECF**