UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, et al.,            )
                                          )
                        Plaintiffs,       )
                                          )
        v.                                )
                                          ) Civ. No. 04-1230 (GK)
DIRK KEMPTHORNE, et al.,                   ) (No dates presently scheduled)
                                          )
                        Defendants.        )

## PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION

Pursuant to Fed. R. Civ. P. 59(e), plaintiffs respectfully move for reconsideration of an

aspect of the Court's ruling that addresses the "Counterpart Regulations" at issue in this case.

While plaintiffs recognize that reconsideration is a remedy that should be sought only in unusual

circumstances, they believe that it is both necessary and appropriate here for several reasons.

First, plaintiffs believe that the regulations will, in fact, prove to be devastating to the

conservation of the Lynx – a species that has protection under the Endangered Species Act

("ESA") only by virtue of this Court's past rulings – as well as hundreds of other listed species

whose survival and recovery quite literally depend on the effective functioning of the ESA

section 7 consultation process.  See, e.g., Bean, The Evolution of National Wildlife Law 355

(1983) (describing the section 7 process as the ESA's "most potent weapon against the loss of

species"); Houck, The 'Institutionalization of Caution' Under § 7 of the Endangered Species Act:

What Do You Do When You Don't Know?, 12 Envtl L. Rep. 15001, 15001 (1982)

(characterizing section 7 as the "conscience of contemporary environmental law").

Second, although plaintiffs recognize that even fundamentally unwise policy choices are not necessarily unlawful, plaintiffs believe that the Counterpart Regulations should be set aside and remanded for legal reasons that the Court did not address in its ruling.  In particular, since the Court devoted most of its discussion of the Counterpart Regulations to application of the Chevron framework, the Court did not squarely address plaintiffs' specific arguments as to why the regulations should be deemed "arbitrary and capricious" under State Farm principles.  See Motor Vehicle Mfrs Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52 (1983) ("State Farm").  When those principles – especially as recently articulated and employed by the D.C. Circuit to find various agency actions infirm on State Farm grounds – are applied to the Administrative Record here, plaintiffs respectfully submit that the regulations, and the government's defense of them, suffer from overriding legal defects that are not discussed in the Court's ruling.

## REASONS FOR RECONSIDERATION

A request for reconsideration may be granted if the Court "finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal citations and quotations omitted).  Hence, the "moving party must show 'new facts or clear errors of law which compel the court to change its prior position.'"  Scorah v. District of Columbia, No. 03-160, 2004 U.S. Dist. Lexis 27806 *5 (D.D.C. Dec. 17, 2004) (quoting National Ctr. for Mfg. Sciences v. DOD, 199 F.3d 507, 511 (D.C. Cir. 2000)) (internal citation omitted).  While motions for reconsideration "will not be granted if a party is simply attempting to renew factual or legal arguments . . . that have already been rejected by the court,"

Scorah, 2004 U.S. Dist. Lexis 27806 at *5 , this Court has, on occasion, granted such motions on appropriate grounds.  Id. (finding that an earlier order awarding attorneys' fees had been "based on an error of law"); Watkins v. Bureau of Alcohol, Tobacco and Firearms, No. 04-800, 2005 WL 2334277 *1 (D.D.C. Sept. 1, 2005) (granting government's motion for reconsideration of order requiring the release of records because the Court found that the order was inconsistent with the legislative history underlying a statutory change the Court had previously considered); see also National Ctr. for Mfg. Sciences, 199 F.3d at 511 (a motion for reconsideration was "correctly granted based upon what the [district] court found to be clear errors of law").

Plaintiffs respectfully suggest that this is one of the rare cases where reconsideration is appropriate.  As discussed below, for reasons previously raised by plaintiffs, but unaddressed in the Court's ruling, the Counterpart Regulations should not be sustained on the basis of the Administrative Record presently before the Court.[1]

## ARGUMENT

### THE COURT SHOULD RECONSIDER ITS RULING REGARDING PLAINTIFFS' ARBITRARY AND CAPRICIOUS CHALLENGE.

#### A.     Summary Of Relevant State Farm Principles.

The D.C. Circuit has recently reaffirmed that, while courts in this Circuit often "defer[] to administrative agencies on matters relating to their areas of technical expertise," they "do not, however, simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment."  Tripoli Rocketry Ass'n. v. Bureau of Alcohol, Tobacco,

---

[1]  Since the arguments plaintiffs are raising in this motion relate to whether there is, in fact, evidence in the Administrative Record that supports the regulation under review, plaintiffs respectfully suggest that an oral argument – in which the parties can highlight for the Court those aspects of the Record on which they are relying – may be of value in resolving the motion.

Firearms, and Explosives, 437 F.3d 75, 77 (D.C. Cir. 2006). Rather, "[i]n order to survive judicial review in a case arising under § 706(2)(A), an agency action must be supported by 'reasoned decisionmaking,'" and

> [n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that agencies adduce.

Id. (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998) and State Farm, 463 U.S. at 52) (emphasis added; internal quotations deleted).

Accordingly, especially where, as here, an agency is changing its longstanding approach to a particular matter, the agency must "supply a reasoned analysis for the change," State Farm, 463 U.S. at 41, and, "[t]o survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting State Farm, 463 U.S. at 43). Of particular pertinence to this case, the D.C. Circuit has recently stressed that, where an agency's "action is founded on unsupported assertions or unstated inferences [] we will not 'abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence." Tripoli Rocketry Ass'n, 437 F.3d at 83 (quoting Am. Mining Cong. v. EPA, 907 F.2d 1179, 1187 (D.C. Cir. 1990)) (emphasis added) (other internal quotations omitted).

In addition, "[a]n agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious," and "'[u]nless the [agency] answers

objections that on their face seem legitimate, its decision can hardly be classified as reasoned.'"

PPL Wallingford Energy, 419 F.3d at 1198 (quoting Canadian Ass'n of Petroleum Producers v.

FERC, 254 F.3d 289, 299 (D.C. Cir. 2001)) (emphasis added). The D.C. Circuit has very

recently invoked these and related APA principles in the course of remanding and setting aside a

variety of agency actions – including actions asserted by agencies to be quintessential exercises

of their "technical expertise."[2]

### B.    The Court's Ruling Does Not Address Plaintiffs' Specific Arguments As To Why The Counterpart Regulations Contravene State Farm Standards.

In challenging the Counterpart Regulations, plaintiffs have contended that the regulations

run afoul of Congress's language and intent in enacting section 7(a)(2) of the ESA and the Act as

a whole. In addition, however, plaintiffs' summary judgment memoranda argued at length that,

separate and apart from any Chevron-based concerns, the regulations, and defendants'

explanation for them, cannot survive review under the "arbitrary and capricious" standard as

---

[2]  See, e.g., Tripoli Rocketry Ass'n, 437 F.3d at 76-77 (remanding agency decision to classify a particular fuel as an "explosive" because the Bureau of Alcohol, Tobacco, and Firearms had proffered insufficient data to support its decision, and had also failed to set forth a "concrete standard for classifying materials"); PPL Wallingford Energy, 419 F.3d at 1199 (finding FERC action arbitrary and capricious because the agency failed to "prove the reasonableness of its change in methodology" and failed to "answer[] objections that on their face seem legitimate") (internal citation omitted); El Rio Cruz Neighborhood Health Center, Inc v. U.S. Dep't of Health and Human Services, 396 F.3d 1265, 1267 (D.C. Cir. 2005) (Department of Health and Human Services "was arbitrary and capricious in failing to address evidence before it in concluding that the physicians were ineligible for medical malpractice coverage" pursuant to statutory scheme); Morall v. DEA, 412 F.3d 165, 177 (D.C. Cir. 2005) (DEA's revocation of certificate to dispense controlled substances did not comport with State Farm standards); Southern Co. Services, Inc. v. FERC, 416 F.3d 39, 48 (D.C. Cir. 2005) ("the absence of a valid rationale renders FERC's orders arbitrary and capricious"); New York Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177, 1178, 1183 (D.C. Cir. 2004) (Surface Transportation Board acted arbitrarily and capriciously in granting an application for the "adverse abandonment" of certain rail operations because the "Board's brief, generalized statement fails to provide an 'adequate explanation'" for the action).

articulated by the Supreme Court and D.C. Circuit.  See Plaintiffs' May 3, 2005 Memorandum in

Support of their Motion for Summary Judgment ("Pfs. Mem.") at 49-59; Plaintiffs' July 1, 2005

Combined Opposition to Federal Defendants' Motion for Summary Judgment and Reply in

Support of Plaintiffs' Motion for Summary Judgment ("Pfs. Reply"), at 39-44.

However, while noting that the Court "shares many of Plaintiffs' concerns about the

wisdom and efficacy of the Counterpart Regulations," Mem. Op. at 46 n.17, the Court rejected

plaintiffs' APA arguments on the basis that "there is no dispute that [defendants] complied with

the APA's procedural requirements."  Id. at 47.  In addition – and of particular relevance to this

motion – the Court held that:

> [f]urthermore, a clear rationale, that the Government has consistently articulated,
> underlies the Counterpart Regulations.  That rationale can be summarized roughly as
> follows.  The Services and the Secretary determined that the default Section 7
> consultation procedures contain overlapping requirements, and other inefficiencies, that
> often cause 'unnecessary delay' in the approval of National Fire Plan projects.  See 68
> Fed. Reg. 68254.  Because the number of severe wildfires in national forests has
> increased dramatically in recent years – in 2002 alone there were 88,000 such fires – time
> is of the essence in reviewing projects that would 'treat' forestland at risk of catching fire.
> Id.  The Counterpart Regulations, which streamline the approval process for National Fire
> Plan Projects, allow Action Agencies to 'accelerate the rate at which these types of
> activities can be implemented so that the likelihood of catastrophic wildland fires is
> reduced' while also meeting their statutory duties under the ESA.  Id. at 68255.

Mem. Op. at 47-48 (emphasis added).  The Court found that, in light of this "evidence," it is "not

for the Court to decide whether the Counterpart Regulations represent wise 'substantive

policymaking,'" because the "Court's only role is to determine whether there is a rational

connection between the facts found and the choices made during the rulemaking."  Id. at 48

(internal citation omitted).

Plaintiffs respectfully suggest that, because the Administrative Record actually

demonstrates that there is, in fact, no "rational connection" between the specific facts found by the Services and the agencies' regulatory choice, and because the Services also failed to respond meaningfully to important factual arguments made to it – including by its own experts – the Court's resolution of plaintiffs' arbitrary and capricious argument should be revisited.  As further discussed further below, these important legal issues are appropriate for reconsideration because, while they were raised in plaintiffs' summary judgment papers, they were not addressed in the Court's discussion of plaintiffs' APA claim.

> 1.    **The Regulation Contains No Meaningful Definition Of What Constitutes A "National Fire Plan" Project.**

While the Court's opinion refers to "National Fire Plan Projects" and the asserted need to reduce "unnecessary delay[s]" in carrying them out, Mem. Op. at 47-48, one of plaintiffs' central APA challenges to the regulations is that they never coherently define what constitutes  a "National Fire Plan" project.  See Pfs. Mem. at 57-59.  As plaintiffs have explained, id., the final rule defines a "Fire Plan Project" as "an action determined by the Action Agency to be within the scope of the NFP as defined in this section," and, in turn, defines the "NFP" as the "September 8, 2000, report to the President from the Departments of the Interior and Agriculture . . . outlining a new approach to managing fires, together with the accompanying budget requests, strategies, plans, and direction, and any amendments thereto."  68 Fed. Reg. 68254, 64264 (emphasis added).

But, in response to plaintiffs' contention that the Administrative Record must at least allow for judicial review of these "accompanying" materials comprising the Services' own nebulous definition of what constitutes an NFP Project, the Services candidly conceded that most

of these materials were never even "considered" by the agency decisionmakers.  See Pfs. Summ.
Judg. Mot. Exh. 2 at 2 ("The final rule noted that there were other items associated with the plan
. . . [A]ll that was considered by the FWS was the report.").  The Counterpart Regulations,
therefore, not only give the action agencies unbridled discretion to determine what constitutes an
"NFP project" (and hence the ultimate decision on when the more protective consultation process
may be dispensed with) but allow the action agencies to do so based upon materials expressly
incorporated into the regulatory definition, but that the Services admit to never reviewing before
adopting the final rule.  See Pfs. Mem. at 58.[3]

In this and other crucial respects, plaintiffs' APA challenge is not directed at the
"wisdom" of the regulations, Mem. Op. at 46 n. 17; rather, it is directed at the rule's basic
rationality and conformance with  fundamental APA principles.  Indeed, where, as here, an
agency has utterly failed to articulate the "standards" being used in making vital regulatory
decisions, the Court of Appeals has not hesitated to at least remand for a more reasoned analysis
and explanation.  See Tripoli Rocketry Ass'n, 437 F.3d at 84 (remanding in view of the
"agency's complete absence of standards for determining when a particular material" satisfies the
agency's definition of an "explosive"); Pfs. Reply Mem. at 43 n.25 (citing cases in which D.C.

_____

[3]  Given the open-ended regulatory "definitions" and the lack of any review role by the
Fish and Wildlife Service or NMFS, under the regulation an NFP project is simply whatever an
individual Forest Service or BLM employee says it is.  Indeed, as FWS biologists observed,
under the rule as written, the Forest Service or BLM could classify virtually any timber cutting,
road building, or other project as an "NFP project" in order to sidestep the need for project-
specific consultations with the expert agencies.  See FWS CR A.R., Vol. 2, at B13 ("All power is
in the hands of the action agency.  They initiate the process . . . and unilaterally decide what
projects are 'NFP' projects.") (emphasis added).  Plaintiffs are unaware of any case in which a
court, faced with a State Farm challenge, has allowed such a key term in a regulatory scheme to
be "defined" in such a manner as to make it essentially meaningless.

Circuit has remanded for agencies to better define important regulatory terms).

There is no sound jurisprudential reason why a remand should not occur here as well, where the agencies have not only failed to adopt any meaningful definition of what is even covered by the regulation, but have compounded that legal error by defining NFP projects by reference to vague materials not even included in the Administrative Record and that the agency decisionmakers concede they never read before promulgating the rule. As plaintiffs have previously maintained, that approach to rulemaking is arbitrary and capricious on its face and, under even the most deferential of review standards, calls for a remand for more reasoned decisionmaking. Simply put, Supreme Court and Circuit precedent establishes that defendants cannot have "'articulat[ed] a satisfactory explanation for [their] action,'" Mem. Op. at 48 (quoting State Farm, 463 U.S. at 43), since defendants have never intelligibly defined what the "action" even consists of, i.e., which criteria and standards will be employed by Forest Service and BLM personnel in determining whether to bypass the longstanding consultation process.[4]

> **2.    There Is No Evidence In The Record That The Consultation Process Has Resulted In Delays In NFP Projects And, To The Contrary, The Record Demonstrates That Regional Service Offices Had Already "Streamlined" The Process To Prevent Any Such Delays.**

As noted, the Court found that a "clear rationale, that the Government has consistently

---

[4] Indeed, as plaintiffs have previously explained, the Service's own Regional Directors severely criticized the Counterpart Regulations for, among other reasons, the failure to "provide definitions of key terms" – such as "what projects would fall under the NFP." Pfs. Mem. at 24 (internal citation omitted). Even the Office of Management and Budget could not understand "what really defines a Fire Plan Project," and advised defendants of the "need to provide a tighter description of what constitutes a Fire Plan Project." Id. at 29 n. 12 (emphasis added; internal citation omitted)). Especially in view of such criticisms by officials within the Executive Branch that even they have no clear understanding of the universe of projects the regulation covers, a remand for a more "satisfactory explanation for [the] action" is warranted on that basis alone. State Farm, 463 U.S. at 43.

articulated" for the Counterpart Regulations is that the "default Section 7 consultation"

procedures "often cause 'unnecessary delay' in the approval of National Fire Plan projects," and

that it was necessary to eliminate or reduce these delays "so that the likelihood of catastrophic

wildland fires is reduced . . . ."  Mem. Op. at 47-48 (emphasis added; internal citation omitted).

Hence, the Court's conclusion that "Plaintiffs' APA challenge to the Counterpart Regulations

must fail," id. at 48, appears to be predicated on the Court's belief that there is, in fact,

"evidence" in the Record to support the proposition that the consultation process has resulted in

delays in necessary projects, and that the Counterpart Regulations were designed to reduce such

delays.  Id.[5]

        Plaintiffs recognize that such a rationale – if actually borne out by Administrative Record

evidence – would warrant deference from the Court.  However, the reality is that this rationale

for the rule is not supported by the evidence in the Record, and the Court cannot sustain the rule

based on "unsupported assertions or unstated inferences . . . ."  Tripoli Rocketry Ass'n, 437 F.3d

at 335; id. at 333 ("in this case, [the] agency has provided virtually nothing to allow the court to

determine whether its judgment reflects reasoned decisionmaking").  Indeed, for specific reasons

that are not addressed in the Court's ruling, the rationale articulated by the Court is not only

---

        [5]  While the Court refers to "evidence" and "facts found" in support of the regulation,
Mem. Op. at 47-48, the ruling does not cite any specific evidence in the Record other than the
fact that the "number of severe wildfires in national forests has increased dramatically in recent
years."  Id. at 47.  From the standpoint of plaintiffs' APA challenge, however, the critical factual
question is not whether there are many wildfires on public lands; plaintiffs have never suggested
otherwise.  Rather, as suggested by the Court's ruling, the essential question is whether the
change in the longstanding section 7 consultation procedures is necessary to reduce or prevent
delays in the approval of projects designed to respond to these wildfires.  On that important point
– without which the "clear rationale" for the regulation evaporates, Mem. Op. at 47 – the
"evidence before the agency," State Farm, 463 U.S. at 43, is that the consultation process has not
delayed the implementation of NFP projects.  See Pfs. Mem. at 24-25, 27, 50-54.

unsupported, but is <u>contradicted</u> by the Record, including statements made by the Services' own experts  and in the agencies' own decision documents.  Accordingly, the "relevant data," <u>State Farm</u>, 463 U.S. at 43 – as described by defendants themselves – cannot, as a matter of law, support the "explanation" for the rule that the Court has described.  <u>Id</u>.

Thus, as detailed in plaintiffs' summary judgment memoranda, there is no support in the Record for the proposition that the "default Section 7 consultation procedures . . . often" – or <u>ever</u> – "cause 'unnecessary delay' in the approval of National Fire Plan projects."  Mem. Op. at 47 (quoting 68 Fed. Reg. 68254).  In fact, even the Federal Register Notice cited by the Court – which is the preamble to the final rule – expressly disclaims any such factual basis for the regulation: the Notice says point-blank that "the issue <u>is not whether the regulatory process has delayed NFP projects</u> . . . ." 68 Fed. Reg. 68258 (emphasis added).  Accordingly, in response to comments that the Services had "failed to offer any empirical evidence" of delays in projects due to the consultation process, <u>id</u>., the preamble did not – and did not even attempt to – identify a single NFP project that had ever been delayed because of the preexisting consultation regime (<u>i.e.</u>, in which the action agencies actually do "consult" with the FWS and/or NMFS on all projects that may affect listed species).  <u>Id</u>.[6]

Further, the Record clearly establishes that the consultation process has not resulted, and will not result, in any delays in the approval of NFP projects – especially because agency officials

---

[6]  As plaintiffs have pointed out, <u>see</u> Pfs. Mem. at 29 n.12, this is why an official from the Bush Administration's own Council on Environmental Quality asked "'Ok, so why do we need to fix anything?'"  FWS CR A.R., Vol. 3, at E143.  If the Administration's <u>own</u> officials could not comprehend the underlying rationale for significantly changing the longstanding consultation regulations – especially in the absence of any evidence of delays in the approval of needed projects – it would hardly be overreaching for the Court to remand for a more "reasoned basis for the agency's action . . . ."  <u>State Farm</u>, 463 U.S. at 43.

had <u>already streamlined the consultation process</u> in a manner that would expedite NFP projects while, at the same time, preserving the safeguards of the longstanding consultation procedures. As plaintiffs explained in their summary judgment memoranda, <u>see</u> Pfs. Mem. at 51-54, shortly before the Counterpart Regulation were adopted, the Services, USFS, and BLM had taken specific steps to streamline the process for reviewing NFP Projects.[7]

Because of these and other very recent agency actions specifically designed to expedite the review and approval of NFP Projects (while preserving the species safeguards inherent in the longstanding consultation process), the FWS's own Regional Directors – who are responsible for day-to-day management of the consultation process – advised the agency decisionmakers that the Consultation Regulations were simply <u>unnecessary to avoid delays and/or to expedite any needed projects</u>. <u>See</u> Pfs. Mem. at 24, 25 n.8, 54 n.25 (quoting FWS CR A.R., Vol. 6, at K391; <u>id</u>. at K384; <u>id</u>. at K427) (Regional Directors' statements that the FWS had "<u>successfully streamlined and expedited fire-related consultations</u>, while allowing the Service to continue its assistance to agencies implementing these projects"; that the Services and action agencies had <u>already</u> adopted "formalized streamlined consultation procedures" that allowed necessary projects to move

_____

[7] Thus, in August 2000, the very agencies at issue here agreed to a "general framework for a 'streamlined'" consultation program that would "provide a number of efficiencies . . . without altering or diminishing the agencies' existing responsibilities under the ESA or its regulations." FWS CR A.R., Vol. 10, at S1; Pfs Mem. at 51-52. Even further, in October 2002 – just eight months before the Counterpart Regulations were proposed – the FWS and NMFS adopted a directive called "Alternative Procedures for Streamlining Section 7 Consultation <u>on Hazardous Fuel Treatment Projects</u>," FWS CR A.R., Vol. 10, at S81 (emphasis added), which instructed Service personnel to employ "[s]everal streamlining techniques [that] <u>have been found to be effective</u>," and were already "being used in some areas to facilitate consultation on projects being implemented <u>under the National Fire Plan</u>," while, at the same time, being "consistent with the requirements of section 7(a)(2) and its implementing regulations . . . ." <u>Id</u>. at S82 (emphasis added); <u>see</u> Pfs. Mem. at 52.

forward rapidly without avoiding the species protections afforded by the consultation process; and that "extensive streamlining has already been put in place for NFP projects, and should only improve, as experience is gained.") (emphasis added).[8]

Of course, if the Services, in adopting the final rule, had set forth some "reasoned basis," Tripoli Rocketry Ass'n, 437 F.3d at 83, for finding that these recently adopted streamlining procedures were inadequate to prevent delays in NFP projects, or for disregarding the views of the Services' own officials who were implementing these procedures on the ground, it would not be the Court's role to substitute its judgment for that of the agencies.  Critically, however, that is indisputably not what the agency decision documents say.

To the contrary, in response to public comments, the preamble to the final rule conceded that these preexisting procedures were working, i.e., they "streamline the process significantly by improving coordination between the consulting agencies," and, moreover, that "[t]hese types of

_____

   [8]  The Regional Directors also specifically explained why eliminating the Services' role in reviewing "not likely to adversely affect" determinations would, in fact, not expedite the review and implementation of NFP projects.  Because steps had already been taken to "successfully streamline[] and expedite[] fire-related consultations," "informal consultations are generally completed within 30 days or less."  FWS CR A.R., Vol. 6, at K391 (emphasis added). Importantly, however, according to agency officials conducting the consultations, even that brief time for review does not add any delay in the approval process because it occurs simultaneously with other project review processes that are totally unaffected by the Counterpart Regulations. See id. ("Considering the other regulatory processes (such as the National Environmental Policy Act, consultation with the State Historic Preservation Office, and Native American consultation), these regulations are unlikely to reduce the time frame for decisions") (emphasis added); id. at K402 ("The short response time is not likely to change with these counterpart regulations.") (emphasis added); id at K420-21 ("informal consultation is already an efficient, timely process"). This is precisely why defendants are admittedly unable to document that informal consultations have contributed to any delays, or that the Counterpart Regulations are needed to address such delays.  At the least, under State Farm precepts, defendants must set forth some reasonable explanation for why this record evidence – proffered by the agency's own experts in the consultation process – does not completely undercut the ostensible rationale for the rule.

streamlining processes <u>can work well to meet statutory timelines</u>."  68 Fed. Reg. 68259

(emphasis added); <u>see also</u> Pfs. Mem. at 54.  Likewise, the Environmental Assessment

acknowledged that there are "streamlining processes" already in place that "<u>work well</u>," and that

allow "established timelines [to] be met" without fundamental changes in the consultation

process.  FWS CR A.R., Vol. 4, at G183 (emphasis added); <u>see also</u> Pfs. Mem. at 27.[9]

The Court's ruling does not address these recently adopted streamlining measures, nor the

agencies' own concessions that they in fact "work well" to avoid delays in the approval of NFP

projects.  Likewise, the Court's ruling does not address plaintiffs' argument that, even apart from

these <u>NFP-specific</u> streamlining measures and their strong endorsement by the FWS's own

Regional Directors, the Services have long had a regulation on the books that broadly authorizes

the Services to respond to <u>any</u> "emergency circumstances" that might "mandate the need to

consult in an expedited" fashion.  50 C.F.R. § 402.05(a); <u>see</u> Pfs. Mem. at 53.[10]

---

[9]  Since defendants were compelled to concede that there have been no delays in NFP projects due to the consultation process, and that the process had <u>already</u> been "streamlined" for the precise purpose of avoiding such delays, the Services actually wound up proffering a very different rationale than the one the Court describes in its opinion.  <u>See</u> Pfs. Mem. at 54.  Hence, the Services stated that, while the already implemented "streamlining" processes in fact "work well" to avoid delays, they "still <u>encumber the Service's biologists</u> in requiring concurrences for NLAA actions . . . ."  68 Fed. Reg. 68259 (emphasis added).  As plaintiffs have argued, this alternative rationale for the rule – which is <u>not</u> relied on in the Court's ruling, presumably because it makes no sense – amounts to no rationale at all.  It is certainly not a "satisfactory explanation," <u>State Farm</u>, 463 U.S. at 43, for defendants to say that they were changing the consultation process merely because FWS personnel were "encumber[ed]" with performing the same consultation role that they have been playing for <u>decades</u>, and that they are still performing with respect to other agency actions.

[10]  Once again, this provision for "expedited" consultation "applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc.," 50 C.F.R. § 402.05(a), and hence could certainly  be invoked, if necessary, to address the very situation identified in the Court's ruling, <u>i.e.</u>, where "time is of the essence in reviewing projects that would 'treat' forestland at risk of catching fire."  Mem. Op. at 48.

In short, since the Record definitively establishes, and defendants have, in effect, conceded, that the "default" section 7 procedures do not "often cause 'unnecessary delay' in the approval of National Fire Plan projects," Mem. Op. at 47, the only conclusion consistent with State Farm standards is that there is no "rational connection between the facts found" (i.e., the lack of delay caused by consultation, and the prior implementation of effective streamlining procedures) "and the choices made during the rulemaking" (i.e., the total elimination of informal consultation between the action agencies and the Services on specific NFP projects). Id. at 48; see also Tripoli Rocketry Ass'n, 437 F.3d at 83 (courts resolving APA claims "will not 'abdicate the judicial duty carefully to 'review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence.'" (internal citations omitted); PPL Wallingford Energy, 419 F.3d at 1198 ("We have stressed that '[u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.'") (internal citation omitted).[11]

---

[11] The Court may have assumed that there was record evidence demonstrating that the longstanding consultation process "often cause[s] 'unnecessary delay' in the approval" of NFP projects, Mem. Op. at 47, because the preamble to the proposed rule contains such an assertion without citing any data to support it. See 68 Fed. Reg. 33808 (the "concurrence process for such projects has . . . caused delays") (emphasis added); see Pfs. Mem. at 23. Yet, apparently because defendants recognized that they could not buttress that factual assertion with record evidence, the final rule flatly concedes that "the issue is not whether the [consultation] process has delayed NFP projects," 68 Fed. Reg. 68258 (emphasis added), but, rather, "whether [the process] can be streamlined so as to expedite the projects," and to "ensur[e] that actions supporting the NFP that are NLAA listed species or critical habitat are not delayed." Id. (emphasis added). Once again, however, according to the Regional Directors and the Services' own decision documents, the Services had already effectively "streamlined" the consultation process for NFP projects, and there is no record evidence that these measures have been, or will be, inadequate to avoid any delays in "actions supporting the NFP." See also Pfs. Reply at 41 (explaining that there is also no record evidence suggesting that the consultation process will cause future delays).

3.      **The Court's Ruling Does Not Address Plaintiffs' Arguments
Regarding The Importance of The Longstanding Consultation
Procedures In Protecting Listed Species.**

In its rejection of plaintiffs' APA claim, the Court also did not address plaintiffs' specific,

record-based arguments regarding why the elimination of informal consultation – i.e., allowing

the USFS and BLM to make their own "not likely to adversely affect" determinations – will, in

fact, seriously undermine the survival and conservation of the Lynx and a plethora of other listed

species whose habitats exist either entirely or largely on public lands.  See Pfs. Mem. at 55-57.

Indeed, the FWS's own Regional Directors pinpointed a number of important ways in which the

Services' reviews of NLAA determinations have, for decades, contributed directly to the

overarching species preservation objectives of the ESA.  Id.  These arguments are essential to

plaintiffs' State Farm argument, and they strongly counsel in favor of a remand here as well.

In particular, the Services' own Regional Directors, along with the agencies' biologists

and other commenters, urged defendants to consider at least three interrelated ways in which the

Lynx and other imperilled species will surely be harmed by the exclusion of FWS personnel from

individual NLAA determinations, i.e, through (1) the loss of unique expertise; (2) the loss of

critical independence from the action agency's preferred project; and (3) the loss of biological

information that is crucial to meaningfully assessing cumulative impacts and "baseline"

conditions.  These important concerns, however, are not addressed in the Court's discussion of

plaintiffs' APA claim.  More important, the Administrative Record before the Court does not

contain – as it must do to survive judicial scrutiny – any "reasoned analysis," State Farm, 463

U.S. at 42 (emphasis added), as to why the agency's own consultation experts are off-base with

regard to these ways in which elimination of the need for Service "concurrences" in NLAA determinations will hasten the extinction and forestall the conservation of the Lynx and other listed species.

First, the Regional Directors explained that, as the Congressionally designated experts on listed species, the Services have, through the informal consultation process, in fact played a vital role in convincing the USFS, the BLM, and other action agencies to routinely make modifications in projects that "have tremendous conservation benefit[s]."  FWS CR A.R., Vol. 10, at K427 (emphasis added).[12]  Since, as the Court of Appeals recently stressed, the Services are the "expert agencies" in the "best position" to evaluate "what measures might be appropriate to protect" listed species, City of Takoma, Washington, 460 F. 3d at 75, and since the Services have employed that special expertise during informal consultations to urge NFP project revisions that benefit the Lynx and other listed species, then it necessarily follows that the elimination of such project-by-project reviews will harm these listed species.  Yet this damaging consequence of the final rule – i.e., the loss of the unique opportunity for the expert agency to recommend project revisions before the project is implemented – is never squarely addressed anywhere in the

---

[12]  See also id. ("A great number of [NLAA] determinations are made only after the Service reviews the proposed action and identifies measures to avoid adverse effects.  Although many informal consultations result in only minor changes, those changes have tremendous conservation benefits."); id. at K420 ("[T]he informal consultation process on a regular basis serves to avoid or minimize project impacts to listed species in a manner that ultimately eliminates the need for formal consultation.") (emphasis added); Pfs. Mem. at 56-57; City of Takoma, Washington v. FERC, 460 F.3d 53, 75 (D.C. Cir. 2006) ("expert agencies [such as [NMFS] and [FWS]] are far more knowledgeable than other federal agencies about the precise conditions that pose a threat to listed species, and . . . are in the best position to make discretionary factual determinations about whether a proposed agency action will create a problem for a listed species and what measures might be appropriate to protect the species.") (emphasis added).

Record.  See Pfs. Mem. at 57.

Second, in addition to guaranteeing the benefits of the Services' expertise in listed species, the Regional Directors (and other commenters) explained that the informal consultation process has in fact protected listed species by bringing an impartial perspective to bear on projects that the action agencies wish to pursue.  Thus, as explained by the Regional Director of Region 6 – the regional office with principal responsibility for conservation of the Lynx, see Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 676  (D.D.C. 1997) ("Lynx I") ("Region 6 . . . assumed the principal duties of conducting a status review and drafting a proposed listing decision.") – the Services' concurrence determinations are crucial because:

> [t]he Action Agencies have different missions than the Service and we cannot discount the overriding conflicts that the agencies' wildlife, plant, and fishery biologists face from internal pressures to meet quotas for timber salvage harvest, prescribed fire, etc.  Thus, we do not believe that implementation of this proposed regulation will be equally effective as protective of listed species and designated critical habitat as the current procedures.

FWS C.R., Vol. 10 at K421 (emphasis added).

Hence, the Services' on-the-ground experts – who have actually been conducting informal consultations on the Lynx and other listed species – made it clear that eliminating project-by-project review by the Services would inexorably have serious adverse impacts on listed species.  This view was shared by the other agency experts in the consultation process, who likewise highlighted the unavoidable loss in "objectivity" that would result from the rule change.  See id. at K416 ("Action Agencies will be challenged to maintain biological objectivity in light of differences in primary agency missions" (emphasis added); id. at K391 ("We serve as an outside and independent agency to review projects . . . The counterpart regulations will diminish

the Service's role in Section 7 consultation.") (emphasis added); Pfs. Mem. at 24, 54-56. Yet,
while acknowledging commenters' concern that "eliminating the Service concurrence is like
asking the fox to watch the henhouse," 68 Fed. Reg. 68259, the Services never set forth a
satisfactory explanation for why their own Regional Directors are wrong in their assessment of
the tremendous value of an independent, up-front review of specific NFP projects favored by
action agencies.[13]

Third, the Services' Regional Directors and other consultation experts gave very specific
reasons as to why – even aside from the Services' superior objectivity and expertise with regard
to listed species – allowing action agencies to unilaterally make NLAA determinations would
inevitably impair species conservation over the long run. In particular, they explained that any
scientifically valid analysis of project impacts requires an ability to evaluate cumulative impacts
– i.e., how a particular project, that might appear insignificant in isolation, may harm a species
when viewed in conjunction with other projects that may also affect the species' "baseline"
condition. See Pfs. Mem. at 56 n. 27; Pfs. Reply at 19-20; see also 50 C.F.R. § 402.02
(consultation regulations defining "[e]ffects of the action" as the "direct and indirect effects of an
action on the species or critical habitat, together with the effects of other activities that are

---

[13] As plaintiffs have explained, the Regional Directors' concern that the Services should
continue to serve as a critical check on action agency employees – who inevitably face internal
pressures to green light projects that the action agencies advocate – parallels the reason that
Congress created the consultation process in the first instance. See Pfs. Mem. at 46, 56. Indeed,
this concern – that the "fox" should not be put "in charge of the henhouse" – was echoed by the
congressional authors of the ESA and its amendments, who were "fully aware of the commitment
that many line agencies have to the completion of proposed projects," and who therefore rejected
a process under which the action agencies would make their own determinations of whether to
proceed with potentially harmful projects. See A Legislative History of the Endangered Species
Act of 1973, As Amended in 1976, 1977, 1978, and 1980, 995 (1982) (statement of Senator John
Chafee).

interrelated or interdependent with that action, that will be added to the environmental baseline").
The Regional Directors explained that the Services – which must routinely collect "baseline"
data to address species issues throughout species' entire ranges and with respect to a variety of
agencies and actions – are, by necessity, in a far superior  position to evaluate whether a
particular project, along with other projects, will "adversely affect" a species than is a single
action agency.  See, e.g., FWS CR A.R., Vol. 10, at K419 ("We believe it will be difficult for the
action agencies to continually update the environmental baseline conditions for each species, as
they will not automatically receive information about the affected species throughout its
range.").[14]

      Defendants' failure to meaningfully address these three specific reasons why the
Counterpart Regulations will impair the protection of listed species – just like the Services'
failure to coherently explain the need for any change in a system that is, in fact, causing no
project delays – goes to the heart of State Farm arbitrary and capricious review; hence, it raises
vital legal – and not merely policy – questions.  If, in fact, the Regional Directors and the

---

      [14]  As explained in several of plaintiffs' standing declarations, this concern is especially
acute with regard to wide-ranging species like the Lynx.  See Pfs. Reply at 19-20.  Indeed, as of
the date of filing plaintiffs' reply memorandum, the Forest Service had already invoked the
Counterpart Regulations to avoid project-specific consultations regarding more than a dozen
projects that "cumulatively have resulted in over 1,155 to 1,440 acres of areas used by lynx or
where lynx may occur being logged," as well as an "unknown number of roads – both temporary
and permanent – being constructed."  Declaration of David Werntz at ¶ 17 (Pfs. Summ. Judg.
Exh. 4).  However, since the Services are no longer able to weigh in on the cumulative impact of
these and other projects before they are implemented, the Regulations are clearly harming the
Lynx and other listed species in this manner, as the Services' own biologists advised the
agencies.  See also Pfs. Reply at 20 n.14 (quoting e-mails from FWS biologists that the rule
change will impair the Services' ability to "track changes in the environmental baseline," and
using the spotted owl as an example of a species that has suffered extensive cumulative habitat
impacts on national forest lands, although each individual timber project affects "only a few
acres of harvest").

Services' own biologists are correct in their assessment – i.e., that the change in the longstanding

consultation process furthers no necessary purpose, but will harm the Lynx and other listed

species that are the intended beneficiaries of the process and the ESA as a whole – surely, at a

bare minimum, this is "an important aspect of the problem" that calls into question the rationality

of a major rule change.  State Farm, 463 U.S. at 43.

Moreover, under Circuit precedent, it is not sufficient for the Services simply to maintain

that they were aware of these concerns and opted to adopt the rule anyway.  Rather, as the D.C.

Circuit has explained in the course of rejecting another FWS decision implementing the ESA,

"'knowing' is not, in any event, the same as actually considering the problems raised by"

commenters.  Gerber v. Norton, 294 F.3d 173, 183 (D.C. Cir. 2002) (emphasis added).

Accordingly, "'[t]his Court is obligated to overturn a rulemaking as arbitrary and capricious

where the [agency] has failed to respond to specific challenges that are sufficiently central to its

decision.'"  Id. (emphasis added) (quoting Appalachian Power Co. v. EPA, 249 F.3d 1032, 1059

(D.C. Cir. 2001)) (other internal citations omitted).  Here, since the Services have simply not

"respond[ed]" in any meaningful way to the "specific challenges" raised by the agencies' own

consultation experts, the rule should be remanded.  Id.; see also Lynx I, 958 F. Supp. at 685

("Although the Court must defer to an agency's expertise, it must do so only to the extent the

agency utilizes, rather than ignores, the analysis of its experts.").

It is especially important that the Court scrutinize the agency's specific analysis (or lack

thereof) in this case in order to ensure that the rule is not "founded on unsupported assertions or

unstated inferences."  Tripoli Rocketry Ass'n, 437 F.3d at 83 (internal citation omitted).   The

Services' longstanding consultation regulations – which require the Services to concur in all

NLAA determinations – are certainly a "'settled course of behavior [that] embod[y] the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.'" State Farm, 463 U.S. at 41-42 (internal citation omitted).[15]

It is likewise beyond dispute that the overriding "polic[y] committed to" the Services "by Congress" is the survival and conservation of imperilled species. See, e.g., TVA v. Hill, 437 U.S. 153, 194 (1978) (Congress made it "abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"). Consequently, since the Services' own Regional Directors and other on-the-ground consultation experts have advised the Services of how deviating from the agencies' "settled course of behavior" will subvert this overriding ESA policy with regard to hundreds of endangered and threatened species, the agencies must clearly explain

---

[15] As explained in plaintiffs' summary judgment memoranda, since 1978, the Services' regulations have consistently construed section 7 as requiring up-front consultation with an expert agency on every project that "may affect" listed species – a requirement that is discarded by the Counterpart Regulations. See 43 Fed. Reg. 870, 871 (Jan. 4, 1978) ("Section 7's mandatory directive is quite clear in requiring the initiation of consultation upon a determination that an activity or program may affect a listed species or its critical habitat . . . .[C]onsultation is mandatory in those situations.") (emphasis added); see also Pfs. Reply at 36-37. In addition, when the Services adopted the current version of the "default" regulations in 1986, they deliberately retained the low "may affect" threshold for project-specific consultations, and rejected a proposal under which action agencies would be permitted to make their own NLAA determinations, precisely because of the acknowledged need to "utilize the expertise of the Service to evaluate the [action] agency's assessment of potential effects or to suggest modifications to the action to avoid potential adverse effects." 51 Fed. Reg. 19926, 19949 (emphasis added); See also Pfs. Mem. at 48-49 & n. 23; Pfs. Reply at 37. Accordingly, by eliminating – for the first time in the history of the Services' implementation of section 7 – the low "may affect" threshold for triggering prior FWS reviews of specific projects, it is indisputable that the Services, like the agency before the Supreme Court in State Farm, departed from a "settled course of behavior [that] embodie[d] the agency's informed judgment" on how best to carry out the purposes of section 7 and the ESA as a whole. State Farm, 463 U.S. at 41-42.

why they resolved this "important aspect of the problem" in the way that they did, and how their "expertise [was brought] to bear on the question[s]" raised by the Regional Directors and others. State Farm, 463 U.S. at 43, 54 (emphasis added). They have failed to do so.[16]

## CONCLUSION

For important legal reasons raised in plaintiffs' summary judgment papers but unaddressed in the Court's rejection of plaintiffs' APA claim defendants have "offered an explanation for [their] decision that runs counter to the evidence before the agency" – including evidence adduced by the agencies' own experts in the field – "failed to consider an important aspect of the problem," and reached a result that is clearly contrary to, rather than the "product of agency expertise." State Farm, 463 U.S. at 43. Plaintiffs, therefore, respectfully urge the Court to reconsider its rejection of plaintiffs' APA claim and set aside and remand the rule for the

_____

[16] As plaintiffs have previously explained, for a number of common-sense reasons reflected in the Record, the Service's post hoc "monitoring" of a "sample" of NLAA determinations made by action agencies cannot conceivably answer the objections raised by the Regional Directors and Services biologists regarding what is unavoidably lost by eliminating the requirement for Service approvals of NLAA determinations. See Pfs. Mem. at 33 & n.13. For example, such "monitoring" – which occurs long after the projects have been carried out – cannot compensate for the loss of Service input into the formulation of projects at the time they are being implemented. Even worse, the Record reflects that the "monitoring" is not designed to "evaluate whether the Action Agency made the same determination the Service would have made on a project," FWS CR A.R., Vol. 5 at I113 (emphasis added), and that the program will be deemed a success even if the monitoring reveals that the action agency has failed to make an "accurate," biologically defensible determination with regard to the impact of projects on listed species 5% of the time. Id. at I124. In other words, this Record evidence – which is not discussed in the Court's ruling – makes clear that the Services themselves do not expect the new process to be as protective of listed species as the process it is replacing and, moreover, they will accept a biologically erroneous decision with respect to one out of every 20 NFP projects adversely affecting listed species. This is the antithesis of carrying out the "policies committed [to the Services] by Congress," State Farm, 463 U.S. at 41-42, and "insur[ing]" that any action . . . is not likely to jeopardize the continued existence" of a listed species, 16 U.S.C. § 1536(a)(2) (emphasis added), and further underscores the appropriateness of reconsideration here.

Services to better address the issues outlined above.[17]

Respectfully submitted,

s/_____
Eric R. Glitzenstein
D.C. Bar No. 358287
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W. , Suite 700
Washington, D.C. 20009
(202) 588-5206

Michael P. Senatore
D.C. Bar No. 453116
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, DC 20005
(202) 682-9400

Counsel for Plaintiffs

---

[17] If the Court agrees, plaintiffs also request that the Court vacate the remainder of its discussion of the rule – particularly its consideration of the Chevron framework – since those issues may prove unnecessary for resolution, or may change, in light of the Services' action on remand. In addition, the Court's finding that "FWS promulgated the default Section 7 consultation procedures and that Congress later codified them in the 1978 Amendments," Mem. Op. at 6 (emphasis added), would appear to dictate that summary judgment be entered for plaintiffs, not defendants. Thus, the consultation regulation endorsed by Congress in 1978 specifically required the "initiation of consultation" upon "a determination that an activity or program may affect a listed species or its critical habitat." 43 Fed. Reg. 870, 871 (emphasis added). Moreover, the 1978 House and Senate Reports, as well as other statements in the legislative history, indicate that Congress, in 1978, specifically ratified the requirement for prior consultation with the expert agencies in regard to every project that "may affect" a listed species or critical habitat in any fashion. See Pfs. Mem. at 44-45; Pfs. Reply at 38; ESA Leg. Hist. at 735, 744, 943-44. Accordingly, if "Congress reviewed the default consultation procedures in 1978, and passed ESA Amendments codifying them," Mem. Op. at 45 (emphasis added), this would appear to lead to the conclusion that judgment should be entered for plaintiffs on the legality of the Counterpart Regulations, since they expressly authorize action agencies to do what they clearly could not under the 1978 consultation procedures and congressional "ratification" of them, i.e., determine that particular projects "may affect" listed species, and yet dispense with consulting with the Services on such projects before they are implemented.

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused this motion to be filed on all counsel of record by filing

the motion in accordance with the Court's electronic filing procedures.

<u>/s/</u>_____
Eric R. Glitzenstein