# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**DEFENDERS OF WILDLIFE**, *et al.*,       :
                                          :
        **Plaintiffs**,             :
                                          :
v.                                        :       Civil Action No. 04-1230 (GK)
                                          :
**KENNETH SALAZAR**, *et al.*,             :
                                          :
        **Defendants**.             :

## MEMORANDUM OPINION

On September 29, 2006, the Court issued a Memorandum Order, Defenders of Wildlife v. Kempthorne, No. 04-1230 (GK), 2006 WL 2844232 (D.D.C. Sept. 29, 2006) ("Lynx IV") [Dkt. No. 59], which, among other things, upheld a Final Rule issued December 8, 2003, adopting the Joint Counterpart Endangered Species Act Section 7 Consultation Regulations for National Fire Plan Projects ("Counterpart Regulations" or "the Regulations"). See 68 Fed. Reg. 68254 (Dec. 8, 2003).

Plaintiffs filed a timely Motion for Partial Reconsideration [Dkt. No. 61], Federal Defendants and Defendant Intervenor filed Oppositions [Dkt. Nos. 62 and 63], and Plaintiffs thereafter filed a Reply [Dkt. No. 64]. On June 27, 2007, Defendant-Intervenor filed a Notification of Supplemental Authority [Dkt. No. 66], to which Plaintiffs filed a Response [Dkt. No. 67]. In February of 2011, Plaintiffs filed a Notice of Recent Authority [Dkt. No. 98] supporting their Motion for Partial Reconsideration and, on November 1, 2011, they filed yet another Notice of Supplemental Authority [Dkt. No. 99] in support of their Motion for Partial Reconsideration. As to the latter filing, the Federal Defendants filed a Response [Dkt. No. 100], and, on December 2, 2011, Plaintiffs filed a Reply [Dkt. No. 101].


Upon consideration of the many briefs filed, the most recent relevant case law, and the entire record in this case, the Court concludes that Plaintiffs' Motion for Partial Reconsideration should be **granted** for the following reasons.[1]

1.      The Government argues that Plaintiffs have failed to satisfy the rigorous standard for deciding motions for reconsideration under Fed. R. Civ. P. 59(e).  Defendants are correct that motions pursuant to Rule 59(e) are rarely granted and should not be "simply an opportunity to reargue facts and theories upon which a court has already ruled."  State of New York v. United States, 880 F. Supp. 37, 38 (D.D.C. 1995).  It is well established that the justifications for granting a motion for reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal citations and quotations omitted).

In this instance, Plaintiffs have satisfied the Rule 59(e) standard, rigorous as it is, because there is a "need to correct a clear error."  In its decision of 2006, rejecting Plaintiffs' APA challenge to the Counterpart Regulations, the Court relied upon what it believed to be the Government's justification for their adoption.  Defenders of Wildlife, 2006 WL 2844232, at *20.  That justification, which was in fact contained in the original Proposed Rule, stated that the preexisting Section 7 consultation process required extensive and time-consuming interagency consultation and that the proposed procedures would "reduce delays" on fire management projects and would, according to the Government, allow Action Agencies to "accelerate the rate at which these types of activities can be implemented so that the likelihood of catastrophic wildland fires is reduced" while also meeting

---

[1] The Court is well aware of how old Plaintiffs' Motion is, and deeply regrets the delay in deciding it.  Excuses always ring hollow and particularly so when given by federal judges.  I hope the parties will accept the Court's apologies.

their statutory duties under the Endangered Species Act. 68 Fed. Reg. 33806, 33807 (June 5, 2003). The Proposed Rule indicated that the "concurrence process for [NFP] projects has . . . caused delays. The proposed counterpart regulations will effectively reduce these delays. . . ." Id. at 33808. Based on this rationale provided in the Proposed Rule, the Court concluded that the Regulations were not arbitrary or capricious and therefore did not violate the APA. Defenders of Wildlife, 2006 WL 2844232, at *20.

The Court erred in this regard. Not only is the initial rationale contained in the Proposed Rule not supported by the evidence in the record, see infra, but the Government argues that this rationale was not the rationale actually relied upon by the Department of Interior in its final adoption of the Counterpart Regulations. As Federal Defendants stated in their Opposition to the Plaintiffs' Motion, "the final rule simply does not rely upon past delays as a justification for the counterpart regulation." Fed. Defs.' Opp'n to Pls.' Mot. for Recons. 5. Indeed, the Plaintiffs themselves concede that if this was the actual rationale and it was supported by evidence in the Administrative Record, it would properly survive an "arbitrary and capricious" challenge. Pls.' Mot. for Partial Recons. 10 ("Pls.' Mot. for Reconsideration").

Since the Court based its "arbitrary and capricious" ruling on the Defendants' initial position that past delays on NFP projects justified the Proposed Rule, when in fact Defendants' ultimate justification was "to proactively reduce . . . anticipated delays," 68 Fed. Reg. at 68257, the Court committed "clear error" and must now consider Plaintiffs' APA challenge to the reasonableness of the actual rationale upon which the Government based its adoption of the Regulations.

2.  As already discussed, Defendants first relied in their proposed Rule on the rationale that the preexisting Section 7 consultation process caused delays which interfered with the review

of projects under the National Fire Plan and treatment of forest areas that were at risk of catching fire. 68 Fed. Reg. at 33807.

The rationale offered in the final adoption of the Regulations, and in all the Government's briefs, is that:

> With the anticipated increase in fire plan projects, the concurrence process <u>could</u> cause delays. These counterpart regulations are being implemented to proactively reduce these <u>anticipated</u> delays and to increase the Services' capability to focus on Federal actions requiring formal consultation by eliminating the requirement to provide written concurrence for [NLAA Actions]. . . .

68 Fed. Reg. at 68257 (emphasis added); <u>see</u> Govt's Opp. to Pls.' Mot. for Recons.

As it turned out, however, and as the agency itself has realized (albeit recently), there is no evidence to support either of two the rationales proffered in the Regulations. There is simply no evidence in the record that the Section 7 consultation process actually resulted in any delay to any National Fire Plan project. The Government itself seemed to recognize that fact in its final Rule when it said that "the issue is not whether the regulatory process has delayed NFP projects, but rather whether it can be streamlined so as to expedite the projects." 68 Fed. Reg. at 68258.[2]

Moreover, there is undisputed evidence in the record that the pre-existing consultation procedures had, in the very recent past, been streamlined so as to expedite the processing of NFP

---

[2] In order to further muddy these murky waters, it must be noted that the final Regulations still include numerous references to the need to "accelerate" the regulatory process, 68 Fed. Reg. at 68260, and argue that they "will provide an additional tool for accomplishing <u>faster</u> reviews." <u>Id.</u> at 68257 (emphasis added).

And to confuse matters even further, the Government has stated that Defendants "posited the same basic justification for the counterpart regulations in both the proposed and final rule." Fed. Defs.' Reply to Pls.' Opp'n to Fed. Defs.' Mot. for Summ. J., at 22.

projects without sacrificing the safeguards contained in those procedures.  FWS CR. A.R., Vol. 10, at 51.[3]  Indeed, a number of Regional Directors at FWS believed that the Service had "successfully streamlined, and expedited fire-related consultation while allowing the Service to continue its assistance to agencies implementing these projects" and that the Service and Action Agencies had already adopted "formalized streamlined consultation procedures" that permitted high priority projects to move forward more rapidly without losing the species protections contained in the consultation process.  FWS CR. A.R., Vol. 6, at K 391.

By the time the Government adopted the final Regulations, it conceded that the preexisting, recently streamlined, Section 7 consultation processes were working:  that streamlined process significantly improved coordination between the consulting agencies, and that "[t]hese types of streamlining processes can work well to meet statutory timelines."  68 Fed. Reg. at 68259.  Interestingly, the Environmental Assessment also recognized that the streamlined processes were in place, "work[ing] well" and enabling "established time lines [to] be met" without damaging the consultation process.  FWS CR. A.R., Vol. 4 at G 183.

Despite conceding that the streamlined practices were working well, the Defendants claimed that the Regulations were needed to avoid delays because they "still encumber the Service's biologists in requiring concurrences for NLAA [not likely to adversely affect] actions . . ."  68 Fed. Reg. at 68259.  Consequently, the "counterpart regulations will accelerate the process of approval

---

[3] The Government has filed several separate Administrative Records pertaining to the Counterpart Regulations.  At Plaintiffs' request, the FWS filed a new Record, including pertinent documents which had been omitted from the first one filed, that now consists of 13 volumes and will be cited as "FWS CR A.R., Vol. __, at __."

for fire plan projects and allow the Service to devote more time to analyzing and coordinating on projects that have adverse effects on listed species and designated critical habitat." Id. at 68260.

It is extremely difficult to comprehend what these sentences mean. There is no explanation in the Regulations as to how the biologists of the two Services (or the Action Agencies) are being "encumbered"; there are no examples of instances in which Fire Plan projects were delayed because of the "encumbrances" that biologists faced in deciding whether to concur with the Action agency's NLAA determinations; and there is no explanation of why or how FWS personnel, particularly biologists, were suddenly "encumbered" by following the same, albeit somewhat streamlined, consultation role that they had been playing for decades and that they were and are still performing with respect to other non-Fire Plan agency actions.

In sum, the Defendants have offered no rational explanation to justify adoption of these Regulations which significantly change long-standing consultation procedures between Action Agencies and Service Agencies in their efforts to comply fully with the Endangered Species Act.

"[I]n order to survive judicial review in a case arising under § 706(2)(A), an agency action must be supported by reasoned decision making." Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 437 F.3d 75, 77 (D.C. Cir. 2006) (internal quotation omitted). It is obvious that "the process by which [an agency] reaches [a] result must be logical and rational." Id. "To survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting Motor Vehicles Mfrs. of U.S., Inc. v. State Farm Auto. Ins. Co., et al., 463 U.S. 29, 43 (1983)).

As the Supreme Court said many years ago in the seminal case of <u>Motor Vehicles Mfrs. of U.S., Inc. v. State Farm Auto. Ins. Co., et al.</u>, 463 U.S. at 41-42, these principles are particularly applicable when an agency is changing a long-standing procedure, especially when the Administrative Record contains no evidence of flaws in the procedure. When an agency is changing a well established and long-standing procedure, such as the preexisting Section 7 consultation process, it must "supply a reasoned analysis for the change." <u>Id.</u> at 41. No such reasoned analysis has been presented in this case.

  3. The absence of a logical rationale is not the only reason for finding adoption of the Counterpart Regulations arbitrary and capricious. The Government continuously refers in its briefs, as do the Regulations, to "national fire plan projects." The problem is that the Regulations never define what a "National Fire Plan" project is. The Regulations contain the following definition of a National Fire Plan project: "an action determined by the Action Agency to be within the scope of the NFP as defined in this section." 50 C.F.R. § 40230. This sentence simply says that a National Fire Plan project is whatever the action agency says it is.

The National Fire Plan is defined as the "September 8, 2000, report to the President from the Departments of the Interior and Agriculture . . . outlining a new approach to managing fires, together with the accompanying budget requests, strategies, plans, and direction, or any amendments thereto." <u>Id.</u> The September 8, 2000, Report to the President itself was lengthy and was accompanied by "strategies, plans, and directions, and amendments . . . thereto." In sum, the definition is so overbroad as to be absolutely meaningless.

Moreover, the "accompanying" material included in the Regulations as part of the definition of a NFP was never even "considered" by FWS, and for that reason was not included in the

Administrative Record. The Government admitted that even though "the final rule noted that there were other items associated with the plan . . . [a]ll that was considered by the FWS was the Report." Pls.' Mot. for Summ. J., Ex. 2 at 2. Given that admission, it is impossible to understand what constitutes and identifies National Fire Plan Projects, other than that they are whatever the Action agency has unilaterally decided "comes within the scope of the NFP as defined in this section." Defendants have not articulated any reasoned or workable standards for determining what projects are included in the National Fire Plan and are therefore subject, under the Regulations, to a different consultation process than has been and is presently used for all other Action Agencies' projects. In short, there is no "concrete standard" for identifying a NFP project, as required by the APA. See Tripoli Rocketry Ass'n, 437 F.3d at 77.[4]

    4.    The Regulations say virtually nothing about the impact of eliminating the vital role played by the preexisting Section 7 procedures, which protected endangered and threatened species under the ESA. There are a number of specific and obvious concerns.

    First, the Service Agencies play a unique role vis-a-vis the Action Agencies. Most critically they are <u>independent</u> from the Action Agencies. The job of the Action Agencies is, naturally enough, to get their projects accomplished. They cannot help but put their major efforts into completion of their statutory mission. The Service Agencies on the other hand approach the ESA issues with an independent, impartial, and objective eye. Their experts for many years have informally consulted with Action Agencies on the lynx as well as many other listed species, and have made it clear that eliminating their individual project review would inevitably have a serious adverse

---

[4] It should be noted that both the Office of Management and Budget, as well as FWS's Regional Directors, complained about the failure to adequately define key terms such as a Fire Plan Project. Pls.' Mem. 24, 29 n. 12.

impact on listed species, including, of course, the lynx. FWS CR. A.R., Vol. 10, at K 416, 421. "We serve as an outside and independent agency to review projects. . . . The counterpart regulations will diminish the Service's role in Section 7 consultation." Id. at K 391. The Regulations never address the concern of numerous commentators that the Counterpart Regulations will be equivalent to asking the fox to watch the henhouse. See 68 Fed. Reg. at 68259.[5]

Second, the representatives of the two Services, namely, the Regional Directors, as well as other consultation experts, have noted that one of the many advantages of the preexisting Section 7 process is that scientists and other experts have been able, as part of their informal consultation and pre-NLAA finding, to advise Action Agencies on how they can make modifications or improvements to their projects so as to provide greater protection to listed species without impairing the mission of the Action Agency. The Regional Directors of the Service Agencies have described the role that they have played in convincing the Forest Service, the Bureau of Land Management, and other Action Agencies as often making modifications to projects that have "tremendous conservation benefit[s]." FWS CR. A.R., Vol. 10, at K 427. Moreover, these project recommendations from the Services' experts are made at a crucial point in time -- before the project is implemented -- and irreversible actions have been taken.

Third, by adopting the Regulations, there will be a loss of the biological information that is necessary for evaluating the cumulative impact of the activities of the Action Agencies, and that is necessary for establishing and then updating baseline conditions for each species from which to measure those impacts. The Government does not deny that the Action Agencies have benefitted

---

[5] This is not to suggest that the Action Agencies are ignoring the ESA; it is simply institutional, as well as human, nature to direct all of one's efforts to accomplish those tasks for which one is directly responsible.

from these informal consultations which have resulted in changes to Action Agencies' projects that benefitted not only the lynx, but other listed species as well.

In summary, the Defendants have failed to confront this significant consequence of the Regulations and "consider an important aspect of the problem." State Farm, 463 U.S. at 43. They have, for all practical purposes, ignored the warnings and advice of their own in-house experts -- their Regional Directors -- about the future adverse impact of the Counterpart Regulations on the many species protected under the Congressional mandate of the ESA.

5.In its Opposition, the Government does not either directly or satisfactorily address the issues cited above. For example, the Government does not deny the claim that there is no specific definition of the National Fire Plan project, but merely says that the two Service Agencies have adopted a flexible definition of actions subject to the counterpart regulations to ensure that the full range of projects intended to reduce risks of catastrophic wildland fires and to restore fire-adapted ecosystems would be eligible for the counterpart procedures. Fed. Defs.' Opp'n to Pls.' Mot. for Recons. 5 (citing 68 Fed. Reg. at 68259). That is simply not a reasoned answer.

With regard to Plaintiffs' argument that there is no evidence that Section 7 consultation actually caused delays in the past, the Government merely says that that argument "misses the mark," and admits that the "final rule simply does not rely upon past delays as a justification for the counterpart regulation." Id. As the Court noted above, the Government has changed its rationale mid-stream and failed to explain its new rationale which predicts -- without any explanation of how it arrived at its prediction -- that the preexisting Section 7 procedures will cause delay in the future and that they "encumber" the Services' biologists.

The Government is quite correct that the Service Agencies do not have to prove that the Counterpart Regulations are "necessary" in order to be upheld by the Court. But what they do have to prove is that the decisions they made "reflect[] a 'rational connection between the facts found and the choice made,'" as well as "'a reasonable explanation of the specific analysis and evidence upon which [they] relied.'" Bluewater Network v. Envtl. Protection Agency, 370 F.3d 1, 21 (D.C. Cir. 2004) (quoting State Farm, 463 U.S. at 43). This the Defendants have failed to do.

6. On November 1, 2011, Plaintiffs filed a Notice of Supplemental Authority [Dkt. No. 99] informing the Court that Defendants, in a Notice published in the Federal Register on October 3, 2011, announced revocation of "the March 4, 2004, National Fire Plan Counterpart Regulation Alternative Consultation Agreements" ("ACAs") between the Forest Service, and NMFS and FWS. Pls.' Notice of Supp. Authority 1 (citing 76 Fed. Reg. 61090 (Oct. 3, 2011)). Those Agreements were the centerpiece of the Counterpart Regulations.

The Regulations themselves have not been revoked or changed in any fashion. What is more, Defendants, in their Response to Plaintiffs' Notice of Supplemental Authority [Dkt. No. 100], stated very clearly that the Counterpart Regulations remain in effect pursuant to a separate ACA with the National Park Service and the Bureau of Indian Affairs. Defs.' Resp. to Pls.' Mot. for Recons. at 2-3. Not only have Defendants not suggested that the Counterpart Regulations will be vacated, thus affecting all Action Agencies, but they have strongly suggested that the Counterpart Regulations would allow the Forest Service and/or BLM to negotiate new ACAs with the Service Agencies. Id. at 4.

Despite these recent developments, Defendants urge that the case is now moot and the Court should take no action concerning the Counterpart Regulations and should deny Plaintiffs' Motion

for Reconsideration. Our Circuit has made it clear that where a defendant voluntarily ceases allegedly unlawful action, the case will only be moot "if the defendant shows that (1) there is no reasonable expectation . . . that the violation will recur, and (2) 'interim relief or events have <u>completely and irrevocably</u> eradicated the effects of the alleged violation.'" <u>Larsen v. U.S. Navy</u>, 525 F.3d 1, 4 (D.C. Cir. 2008) (quoting <u>Cnty. of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979)) (emphasis added). Defendants' Response clearly demonstrates that interim relief or events have not "completely and irrevocably eradicated the effects of the alleged violation."

<u>Id.</u> Moreover, the Supreme Court in <u>Parents Involved in Cmty Sch. v. Seattle Sch. Dist. No. 1</u>, has ruled that defendants have the "heavy burden" of demonstrating that the allegedly ameliorative actions they have taken make it "absolutely clear that the allegedly wrong behavior could not reasonably be expected to recur." 551 U.S. 701, 719 (2007) (internal quotations omitted). Again, not only have Defendants not carried that heavy burden, but they have indicated that future ACAs could "reasonably be expected to recur."

Thus, Defendants' claim of mootness is without any merit. As they have made clear in their Response, the Counterpart Regulations themselves have not been set aside, and it is certainly possible that future ACAs could be negotiated between Action Agencies and Service Agencies under the Regulations.[6]

---

[6] Plaintiffs also argue that the documents explaining the revocation of the Agreements in question are further evidence that the Counterpart Regulations' process is not as protective of the listed species as the preexisting Section 7 Consultation process was. The Court, of course, cannot and does not rely on information outside the Administrative Record or on information obtained by the Defendants after adoption of the Regulations in determining whether the action being challenged was reasonable at the time it was taken.

For the foregoing reasons, the Plaintiffs' Motion for Reconsideration is hereby **granted**. An Order will issue with this Memorandum Opinion.


February 6, 2012                                /s/
                                                Gladys Kessler
                                                United States District Judge